Teresa S. McLAREN, Appellant,

v.

Darren G. McLAREN, Appellee.

No. S–13031.

Supreme Court of Alaska.

Jan. 20, 2012.

chasing the real property he will rent is "very unusual" and "not normal."

---

18. *Id.*

19. Restatement (Second) of Contracts § 375 (1981).

**324**

Teresa S. McLaren, pro se, Glennallen, Appellant.

Wayne Anthony Ross, Ross & Miner, P.C., Anchorage, for Appellee.

Before: CARPENETI, Chief Justice, FABE, WINFREE, and CHRISTEN, Justices.

*OPINION*

CARPENETI, Chief Justice.

## I. INTRODUCTION

A husband sued his wife for divorce. The superior court divided the couple's property, intending to award each spouse approximately half of the marital estate. The wife, who appeared pro se in the proceedings below and remains unrepresented, appeals multiple aspects of the property division. After a thorough review of the record, we conclude that the superior court correctly resolved all of the issues appealed. Accordingly, we affirm the decision of the superior court.

## II. FACTS AND PROCEEDINGS

### A. Facts

Teresa and Darren McLaren began living together in 1988 although the approximate date of Teresa's divorce from her second husband was July 1, 1989. Teresa and Darren did not become legally married until October 24, 1999. They had no children together and separated in 2005. Darren sued Teresa for divorce in October 2006.

Darren provided initial disclosures to Teresa as required by Alaska Civil Rule 26.1, but Teresa did not meet her responsibility to provide disclosures to Darren. Several times, Darren's counsel asked Teresa for discovery; though she eventually responded, her responses were deficient, leading the court to issue an order compelling her to provide complete discovery responses. After Teresa still failed to provide Darren with the records he had requested—which included information regarding the value of her civil service retirement as well as credit records that would have shown when the credit card debt in her name was incurred—the superior court issued a subpoena duces tecum ordering her to bring the records to her deposition. Teresa refused to attend the deposition and at no point before or during the trial submitted the records Darren had requested, consequently leaving her claims as to the credit card debt and the civil service retirement unsubstantiated. In her response to Darren's first set of requests for production, Teresa stated that she gave Darren's counsel power of attorney to access her civil service retirement; however, this alleged power of attorney does not appear anywhere in the record and she made no mention of it in her testimony.

At trial, the parties disputed the value of several items and disagreed as to whom those items should be awarded. The superior court valued the entire marital estate, including property acquired by the parties during their pre-marriage cohabitation (after July 1, 1989),[1] at $277,868.44, awarding 52.5%

---

1. The dissent correctly notes that the superior court did not make any express findings on the coverture period in this case. But by characterizing cohabitation-period assets as marital, the superior court did implicitly find that the parties' pre-marriage cohabitation, at least beginning when Teresa's divorce became final, should be included in the coverture period. Testimony at trial regarding the parties' commingling of assets before they were married supports the superior court's implicit finding. When Teresa and Darren moved in together, Teresa's two children, aged 11 and 13, came with her; Teresa did not seek child support from her former husband, and Teresa and Darren supported the children; payments on property owned by Teresa and her former husband came from Teresa and Darren's checking account; Teresa and Darren together purchased a residence in Anchorage; and they also purchased a lot at Lake Louise. There does not appear to be a real dispute that the parties became an economic unit in July 1989 and continued to be so until and after they married.

to Teresa and the remainder to Darren. Several items and categories of property are at issue on appeal. The relevant facts with respect to these items are as follows:

### 1. Teresa's civil service retirement

The superior court characterized the portion of Teresa's civil service retirement that she earned in the ten years of cohabitation preceding the couple's legal marriage as part of the marital estate.

As noted, Darren made several discovery requests concerning the value of Teresa's retirement, but she did not provide discovery even after the superior court issued an order to compel discovery. At trial, lacking the documentation he had requested from Teresa, Darren presented an expert report estimating the value of the marital portion of Teresa's retirement to be $139,532. Although Teresa questioned the accuracy of the expert's estimate in her trial testimony, she did not offer an alternative valuation. In its findings, the superior court adopted Darren's expert's estimate.

### 2. The Glassply boat, the Jetcraft boat, and the Pioneer stereo

Teresa listed in her asset spreadsheet a number of items that the superior court did not include in its final distribution of the marital estate. These items include: a Glassply boat that Teresa valued at $8,500, a Jetcraft boat that Teresa valued at $6,500, and a Pioneer stereo that Teresa valued at $1,000. On the asset spreadsheet she submitted in discovery and as an exhibit at trial, Teresa characterized these items as premarital. With respect to the Glassply and Jetcraft boats, in particular, Teresa stated in her pretrial brief that they should be awarded to Darren in the final distribution. Thus, Teresa's apparent position was that the boats were Darren's separate property. In the asset spreadsheet he submitted as an exhibit at trial, Darren made no mention of the stereo, but stated that the boats were his premarital property. At trial, neither party offered any specific testimony as to the stereo or either of the boats, and Teresa never revised her initial characterization of the items as premarital. Finally, there is noth-

ing in the record indicating when these items were purchased (that is, before the couple began to cohabit or after).

The superior court did not include any of these items in its findings of fact or in the final distribution spreadsheet, adopting both Darren's characterization and what appeared to be Teresa's position that the items were not part of the marital estate.

### 3. Darren's tools

Darren has a large tool collection that he uses in his work. At trial, Darren submitted evidence that his tools were worth $12,500 and carried $4,677 in outstanding debt, resulting in a net value of $7,823. Darren testified that his valuation included all of the tools he had purchased since the time he and Teresa had "been together." He went on to testify that "a lot of the tools [are] premarital." Because he was referring to tools that he included in the marital estate, it is clear that he meant that he had acquired them before the couple married. Thus, Darren's valuation appears to have included all of the tools he acquired during the relationship, both before they were married and during the marriage. Darren based his valuation of the tools on his own receipts and the opinion of professional tool dealers.

While Teresa also valued the tools several times, her estimates varied greatly from one valuation to the next. In Teresa's June 2007 response to interrogatories, Teresa stated that the tools were worth $20,000. In the asset spreadsheet she submitted in discovery and at trial, Teresa valued the tools at $30,000. Finally, in her reply to the trial brief from October of the same year, she implied that the value of the tools was well over $60,000. She based this estimate on her memory of how much one of Darren's toolboxes cost and the cost of a new set of mechanic's tools similar to the sets that she said Darren had in his collection.

The superior court adopted Darren's valuation, awarding him the tools with a net marital value of $7,822, and making him solely responsible for all the monies owed on them.

### 4. Debts in Teresa's name

There were several debts in Teresa's name alone. In her briefing and later at trial, Teresa stated that these debts were incurred for marital expenses, and were consequently marital in nature.[2]

Darren conceded that one of the debts in Teresa's name, the Atlantic debt, was marital. But he contested the other debts in her name and he requested that Teresa bring her credit records to her deposition so that she could substantiate her claims that the other debts in her name were actually marital debts. Teresa refused to attend her deposition. Darren testified that he had had no knowledge of the debts before the divorce proceedings, implying that Teresa had incurred these debts after the couple had separated, and asserted that the debts should therefore be characterized as Teresa's separate property. The superior court concluded, "Teresa is solely responsible for such debts."

### 5. The antiques/household furnishings

Included in the couple's personal property is a collection of antique furniture. The superior court found:

> The parties own $60,000 of antique furniture. Teresa claims some of this furniture is pre-marital. Darren stated most was purchased during the marriage. The parties are in agreement that the furniture was used in the family house and that Teresa should get that furniture. Teresa is awarded this furniture with the marital value of $45,000.

Darren valued the "antique furniture" at $60,000 and asserted that it was purchased during the marriage. Darren testified that all of the household furnishings were antique except for the bed and computer desk, implying that the $60,000 value he proposed applied to all of the household furnishings, with two minor exceptions. Darren testified that his valuation of the furniture was based on what Teresa had told him it was worth. He went on to say that with the exception of "a few tapestries," most of the antiques had been purchased once the couple was together. In his pre-trial brief and on the asset spreadsheet he submitted at trial, Darren characterized the full $60,000 value as marital property.

In her pre-trial brief, Teresa stated that the whole of the household furniture and antiques was worth "maybe $60,000." On the asset spreadsheet that she submitted in discovery and at trial, she stated that the antiques were her separate property, but did not specify what portion of the household furnishings she considered "antique" or what the value of the antiques apart from the rest of the household furnishings might be. Disputing Darren's statements that nearly all of the antiques were marital, Teresa testified that she purchased most of the furniture in 1982, long before the beginning of the marital community. Again, however, she failed to specify which of the household furnishings she considered antique or what their current value might be. Similarly, in her response to interrogatories, Teresa stated that some of the "furn[iture], antiques, [and] collectibles" were her separate property because they were obtained before the marital community began, but she failed to specify which particular items she was referring to and stated that a current value for this separate property was "unavailable." At trial, Teresa testified that only 30% of the total $60,000 in home furnishings was purchased after she and Darren began to cohabit, controverting Darren's position that the complete $60,000 in home furnishings was marital.

With regard to what portion of the antique furniture was marital, the superior court concluded that 75% of the $60,000 in "Antique Furniture" was marital, and that the remainder was Teresa's separate property.

### 6. The EMC motorhome

Darren estimated that the couple's 1989 EMC motorhome was worth $15,000, but that

2. With respect to the Bank of America credit card debt, in particular, Teresa asserted that while the card was in her name, Darren had incurred the debt on it. She testified that "this card [was] originally a ... card that I had taken out for Darren ... he charged everything ... on that card, I did not charge anything on that" and went on to testify that Darren made these charges while the couple was still together. Darren disputed this at trial, stating that he had no knowledge of the Bank of America credit card debt.

due to an outstanding $14,329.33 on the loan used to purchase the motorhome, the net value was a mere $670.67. Teresa testified that she did not dispute Darren's estimation of the motorhome's net value. Teresa also testified that it was Darren's idea to buy the motorhome, and that the loan to buy the motorhome and the motorhome itself were in his name. Further, Teresa stated that she did not desire ownership of the motorhome because she did not want to suffer the burden of making payments on the outstanding loan. Additionally, Teresa testified at trial that the motorhome "need[ed] a lot of work" that she could not afford. The superior court awarded Teresa the 1989 EMC motorhome at a net value of $1,670.67, with Teresa solely responsible for all debt due on the motorhome.

### 7. Lake Louise property

The parties own two lots at Lake Louise, "Lot 2" and "Lot 3." Matanuska–Susitna borough tax assessment records valued Lot 2 at $26,300 and Lot 3 at $26,600 for tax year 2006. Lot 2 includes a cabin, which Darren described as incomplete and "just a basic weathered-in shell." Darren valued Lot 2 at $56,000, which he explained is the sum of the assessment value plus the amount he paid for the kit that he used to build the cabin. Darren then subtracted the amounts owed on the properties from his total, and reached an equity value of $27,098.61 for the two lots. The trial court adopted Darren's valuation.

### 8. The Landingcraft boat

Though Teresa valued the couple's Landingcraft boat at $10,000 on the asset spreadsheet she submitted as an exhibit at trial, she assigned it other values elsewhere in the record. In her response to Darren's first request for production, Teresa valued the Landingcraft at $30,000. Then, in her reply to Darren's trial brief, she stated that Darren had "completely undervalued it" when he said it was worth $10,000, estimating that "[i]f it was sold tomorrow it would sell for at least $80,000." But the asset spreadsheet she presented as an exhibit at trial—the last valuation of the Landingcraft she submitted to the court—appeared to adopt Darren's valuation, stating the Landingcraft was worth $10,000. When the trial court questioned Darren about the value of the Landingcraft, it appears to have assumed that Teresa's most recent valuation was the one she intended and that, consequently, the parties did not dispute the $10,000 value. At trial, Teresa offered no testimony about the boat or its valuation. When the trial judge asked Teresa if she disputed Darren's valuation of any of the boats, Teresa made no mention of the Landingcraft. The superior court valued the Landingcraft at $10,000 and awarded it to Darren.

### 9. The Grayling boat

The couple also owned a 1991 Grayling boat, which the parties agreed was a marital asset worth $25,000. In her response to Darren's interrogatories, Teresa stated that she wanted the Grayling boat because she had an opportunity to use it for employment. However, in her reply to Darren's trial brief, she stated that she wanted the Grayling because she planned to live on Lake Louise, and would "need a large boat to travel safely on such a large body of water." When Teresa testified at trial, the judge told her that he needed to know why she wanted the Grayling so he could take her reasons into account when making a fair and equitable allocation of the assets; Teresa simply responded: "Because out of the five boats, that is the one I want." At no point during the trial did Teresa mention plans to use the Grayling in business.

Darren, on the other hand, provided the trial court with a detailed account of his plans to use the Grayling in the water taxi business that he was planning to run on Lake Louise. In his trial brief, Darren stated that prior to the separation, he had begun taking steps towards establishing a water taxi and freighting business. Darren explained that the Grayling was purchased for use in that business. Darren testified that he still intended to use the Grayling in running the water taxi business and that he already had an agreement with Hope Cottage to run their tours. The superior court awarded the Grayling to Darren, but, in accordance with

Darren's wishes, awarded Teresa a 14–foot boat that was his premarital property.

### 10. The house

The superior court made the following findings of fact regarding the parties' house:

> In January 2007, Darren received notice that Teresa had not made any payments on the house since March 2006, and as a result the house was in foreclosure. Darren finally was able to work out a payment plan to get that house out of foreclosure. On March 6, 2007 Teresa signed a quit-claim deed signing the house over to Darren and Teresa agreed in open court on April 20, 2007 that Darren could have that house as an advance distribution so Darren could keep the house out of foreclosure. As a result, Darren has had to be solely responsible for the payments on that house from the time of Teresa's default in May 2006 in an amount in excess of $20,000.

The court awarded the house, and all of the debt on the house, to Darren.

### 11. $4,500

The superior court found that "Teresa has testified that she withdrew and kept $4,500 from one of the parties' joint accounts." In the appeal briefs, both parties state or imply that the trial court treated this amount as marital property that had gone to Teresa. In fact, this does not appear to be the case. Darren's proposed findings of fact and conclusions of law say: "Teresa should keep the other accounts, as well as the monies she removed from the joint account, for a total value of $5,076." But the court's findings of fact and conclusions of law say only: "Teresa is awarded the other accounts." The court's property division spreadsheet attributes only $576.15 in bank account assets to Teresa, and does not include the $4,500 anywhere else.

### B. Proceedings

Darren sued Teresa for divorce in 2006. Darren has been represented by counsel throughout the proceedings. While Teresa was initially represented by counsel, her attorney withdrew in February 2007 due to a breakdown in the attorney-client relationship. Teresa appeared pro se for all relevant portions of the proceedings below.

As discussed in detail above, Teresa was generally uncooperative during discovery. Both parties filed pre-trial briefs and testified at trial. At the close of testimony, the trial judge stated that he would leave the record open for ten days to allow the parties to submit their proposed findings of fact and conclusions of law; he specifically instructed Teresa that if there were any specific findings she wanted the court to make regarding any of the property, she should submit them to the court within that ten-day period. While Darren submitted proposed findings, Teresa did not.

In December 2007, the superior court issued its findings of fact and conclusions of law. Teresa appeals several aspects of the court's decision.

### III. STANDARD OF REVIEW

■ Questions of fact are reviewed under the clearly erroneous standard.[3] A factual determination is clearly erroneous if it is unsupported by the record, or if we are left with a definite and firm conviction that a mistake has been made.[4] Valuation is factual and will only be reversed for clear error.[5]

■ It is a function of the trial court, not the reviewing court, to judge the credibility of witnesses and to weigh conflicting evidence.[6] We will generally accept the trial court's determination of the credibility of witnesses since it saw and heard the witnesses first hand.[7]

■ The equitable division of property "is reviewable under an abuse of discretion

---

3. *Moffitt v. Moffitt,* 749 P.2d 343, 347 (Alaska 1988).

4. *Id.* at 348.

5. *Krize v. Krize,* 145 P.3d 481, 487 (Alaska 2006).

6. *Pam R. v. State, Dep't of Health & Soc. Servs.,* 185 P.3d 67, 71 (Alaska 2008).

7. *Dodson v. Dodson,* 955 P.2d 902, 907 (Alaska 1998).

standard and will not be reversed 'unless it is clearly unjust.' "[8] Equal division of property is presumptively valid.[9] The characterization of property as marital or separate is also reviewed under the abuse of discretion standard.[10] Finally, whether or not the equities require invasion of premarital assets is also reviewed for abuse of discretion.[11]

We review the trial court's procedural decisions for abuse of discretion.[12]

We review questions of law de novo.[13]

## IV. DISCUSSION

Equitable division of marital assets by the superior court involves a three-step process.[14] First, the superior court must determine what specific property is available for distribution by characterizing which assets are marital property and which are not. Second, the court must determine the value of this property.[15] Third, it must decide how an allocation can be made most equitably.[16] On appeal, Teresa challenges the superior court's decisions with respect to each of these steps.

### A. Characterization

Teresa argues that the superior court abused its discretion in characterizing several items, including: her civil service retirement; Darren's tools; the debts in her name; and the Glassply boat, Jetcraft boat, and Pioneer stereo. We conclude that the supe-

rior court did not abuse its discretion with respect to most of these items, and where it did, the error was harmless.

### 1. Teresa's civil service retirement

Teresa argues that the superior court abused its discretion by including in the marital estate the retirement that she acquired in the ten years prior to the couple's legal marriage. Darren responds that the superior court's inclusion of this premarital portion in the marital estate was proper because, although the legal marriage did not take place until ten years later, the couple began living together and sharing income in 1988.

Property acquired by a couple prior to marriage may be considered marital if the property was acquired during premarital cohabitation.[17] The general rule is that courts divide property "acquired only during marriage."[18] But "so long as the parties do marry, the trial court is free to consider the parties' entire relationship, including any period(s) of premarital cohabitation, in making its property division under AS 25.24.160(a)(4)...."[19] And, relying on this language from *Murray*, we held in *Faulkner v. Goldfuss*[20] that the basis for determining the marital share of a spouse's military pension was "not necessarily limited to the period of the parties' marriage" and

---

8. *Harrelson v. Harrelson*, 932 P.2d 247, 250 (Alaska 1997).

9. *Elliott v. James*, 977 P.2d 727, 730 (Alaska 1999).

10. *Dragseth v. Dragseth*, 210 P.3d 1206, 1208 (Alaska 2009).

11. *Odom v. Odom*, 141 P.3d 324, 330 (Alaska 2006) (citing *Chotiner v. Chotiner*, 829 P.2d 829, 834–35 (Alaska 1992)).

12. *Clemensen v. Providence Alaska Med. Ctr.*, 203 P.3d 1148, 1151 (Alaska 2009).

13. *Elliott*, 977 P.2d at 730.

14. *Wanberg v. Wanberg*, 664 P.2d 568, 570 (Alaska 1983).

15. *Id.*

16. *Id.*

17. *Chase v. Chase*, 109 P.3d 942, 947 (Alaska 2005).

18. AS 25.24.160.

19. *Murray v. Murray*, 788 P.2d 41, 42 (Alaska 1990). AS 25.24.160(a)(4) states that the court may provide "for the division between the parties of their property, including retirement benefits, whether joint or separate, acquired only during marriage, in a just manner and without regard to which of the parties is in fault; however, the court, in making the division, may invade the property, including retirement benefits, of either spouse acquired before marriage when the balancing of the equities between the parties requires it...."

20. 46 P.3d 993 (Alaska 2002).

could include the period of cohabitation.[21] We directed that "[i]f the superior court finds on remand that the parties indeed began cohabiting in October 1994, it should adjust the coverture period accordingly."[22] We review a trial court's characterization of property as marital or separate for abuse of discretion.[23]

It is undisputed that the couple had begun to cohabit by July 1, 1989, and that the couple later became legally married. In light of the evidence that the parties were an economic unit during their pre-marital cohabitation, the superior court had discretion to include in the marital estate property that was acquired during this period of premarital cohabitation. We find no error in the superior court's characterization of this portion of Teresa's retirement.

The dissent questions the propriety of affirming the superior court's characterization of the portion of Teresa's retirement acquired during 1989–99, the period when the parties lived together before marrying, without specific findings by the superior court to justify this characterization of otherwise-separate property. But we have not always required specific findings by the superior court. In *Faulkner v. Goldfuss*,[24] for example, we upheld characterizing property acquired during cohabitation before marriage as marital property without explicit factual findings about either (1) the parties' intent to treat the property as marital or (2) the need to treat the property as marital in order to do equity. In that case we directed the superior court only to determine the period of cohabitation in determining what property was marital.[25]

### 2. The Glassply boat, the Jetcraft boat, and the Pioneer stereo

 Teresa argues that if the superior court did not err in finding that the retirement she earned in the period of premarital cohabitation was marital, then the superior court *did* abuse its discretion by characteriz-

ing as Darren's separate property other items that were also acquired after the couple began to cohabit. Though it is not entirely clear which specific items of property Teresa thinks the superior court treated inconsistently, it appears that she is referring to those items on her spreadsheet that Darren did not include in the marital estate and that the court did not include in its findings: the Glassply boat, the Jetcraft boat, and the Pioneer stereo.

While Teresa contends on appeal that these items were acquired during the ten-year period of premarital cohabitation, there was nothing before the superior court indicating that this was the case. Teresa claims that the superior court's mischaracterization of these items resulted from its failure to appropriately consider her asset spreadsheet, but, in fact, her asset spreadsheet expressly characterized all of these items as premarital. Thus, it appears that the trial court not only considered her spreadsheet, but adopted her position that these items were not acquired during the marital community. At no point during the trial did Teresa revise her characterization of these items, nor did she make any mention of these items in her testimony or even suggest that any of these items were acquired during premarital cohabitation. Consequently, the superior court had no reason to believe that the Glassply boat, Jetcraft boat, and the Pioneer stereo should be treated in the same manner as Teresa's civil service retirement.

In her appeal briefs, Teresa acknowledges that she characterized these items as premarital at trial, but she implies that she would not have done so if she had understood that assets acquired during premarital cohabitation could be included in the marital estate. She states that by labeling the Glassply boat, Jetcraft boat, and Pioneer stereo "premarital," she merely intended to indicate that these items were acquired before the couple was legally married—not that

**21.** *Id.* at 1002–03.

**22.** *Id.*

**23.** *Dragseth v. Dragseth,* 210 P.3d 1206, 1208 (Alaska 2009).

**24.** 46 P.3d at 1003.

**25.** *Id.*

they were acquired before the couple began to cohabit. She implies that had she understood that assets acquired during premarital cohabitation could be included in the marital estate, she would have made a point of telling the trial judge that the couple purchased these items after 1989 so that it would consistently treat all assets acquired during that period. Although she does not make this point explicit, we understand Teresa to be arguing the superior court breached its duty to her as a pro se litigant by failing to ensure that she presented evidence as to precisely when these items were acquired.

▮ Although the superior court owes a special duty to pro se litigants, we have specifically held that this duty generally[26] does not involve an obligation to solicit additional evidence from an unrepresented party. In *Forshee v. Forshee*,[27] a husband appearing pro se failed to offer convincing evidence as to the valuation of certain assets in his divorce trial.[28] On appeal, he stated that he had not submitted more evidence at trial because, being pro se, he had not understood that his case would have been better served by presenting additional evidence; he argued that the superior court breached its duty to him by failing to solicit this additional evidence.[29] We rejected his argument, holding that although pleadings of pro se litigants

should be held to less stringent standards than those of lawyers, and trial judges should take limited steps to mitigate the difficulty of representing oneself, a trial court may not compromise its impartiality by saving a litigant from the litigant's choice of a lawyer, including when a litigant chooses to represent himself.[30]

▮ In the present case, we similarly hold that the superior court had no duty to solicit additional information from Teresa— she bore sole responsibility to present all evidence that might be helpful to her case, and she must bear the consequences of her failure to do so. The possibility that Teresa did not present this evidence because she was confused about the underlying legal concepts does not change this conclusion: Requiring the superior court to inform pro se litigants of all the relevant substantive law would put a trial judge in the precarious position of acting as attorney for an unrepresented party, which is exactly what we sought to avoid in *Forshee*. This is especially true in the present case, where the record shows that even if Teresa did not learn through her own independent research that assets acquired during premarital cohabitation may be included in the marital estate, the proceedings alone provided her with ample notice of that legal proposition.[31] Thus,

---

**26.** We have made an exception to this rule in cases involving domestic violence. *See Williams v. Barbee*, 243 P.3d 995, 1004–05 (Alaska 2010); *Parks v. Parks*, 214 P.3d 295, 301 (Alaska 2009).

**27.** 145 P.3d 492 (Alaska 2006).

**28.** *Id.* at 493.

**29.** *Id.* at 498.

**30.** *Id.*

**31.** Both Darren's trial brief and testimony made clear that he was arguing that items acquired prior to legal marriage should be included in the marital estate. Even a casual review of Darren's brief and testimony would have told Teresa that her understanding of marital property was incomplete and that a revision of her asset spreadsheet was warranted, but Teresa submitted the same asset spreadsheet at trial that she had submitted months earlier in discovery characterizing the Glassply boat, Jetcraft boat, and Pioneer stereo as premarital.

Not only *should* Teresa have been aware that assets acquired during premarital cohabitation could be included in the marital estate, but a close examination of the record strongly suggests that—at least part of the way through the trial— she actually *was* aware of this proposition, and still did nothing to indicate to the court that these items were purchased after the couple began to cohabit. When the trial judge specifically asked Teresa to discuss any items that Darren did not include on his spreadsheet that she felt should be included in the marital estate, she did not mention any of the items on her spreadsheet other than the "three Ford Broncos," which she alleged were acquired during the period of premarital cohabitation. Teresa's mention of the Ford Broncos indicates that, at least by this point in her testimony, she understood that property acquired before the marriage could be included in the marital estate. Nevertheless, she made no mention of the Jetcraft boat, Glassply boat, or Pioneer stereo—none of which was included in the asset spreadsheet Darren submitted at trial— implicitly reiterating her apparent position that these items were not acquired during the life of the marital community.

Teresa should have known to inform the superior court of any items that were acquired after the couple began to cohabit; any failure to do so was not caused by a breach of the trial court's duty, but by Teresa's own lack of attention and care in making her case. Therefore, we affirm the superior court's finding that the Glassply boat, Jetcraft boat, and Pioneer stereo are not marital property.

### 3. Darren's tools

■ Teresa argues that the superior court abused its discretion by not characterizing the tools acquired during premarital cohabitation as marital property. She states that the superior court's valuation only accounts for the tools Darren acquired during the eight years the couple was married, but should have also included the tools acquired during the ten years of premarital cohabitation because the couple was sharing income during that time.

At trial, Darren testified that his valuation included all the tools acquired during the couple's cohabitation, both before and after they became legally married. Because the superior court adopted Darren's valuation, we infer that the superior court's valuation actually *did* include the tools acquired during the period of premarital cohabitation, just as Teresa argues it should have. Therefore, we affirm the superior court's characterization of Darren's tools.

### 4. Debts in Teresa's name

■ The parties disagreed about the characterization of certain debts that were listed in Teresa's name. The superior court considered these debts in its findings and conclusion, and there is no doubt that the superior court assigned Teresa sole respon-

sibility for such debts. But the court's analysis of the disputed debts is somewhat ambiguous: [32] It did not specifically explain whether it characterized the disputed debts as marital or separate, nor did it state how it resolved the factual dispute about when they were incurred. How these debts are characterized—whether separate or marital—affects the net value of the estate and each party's share of the total estate. Because the superior court included the disputed debts in its discussion of "other martial debts" and listed them on the spreadsheet of the marital estate, we conclude that the superior court characterized these debts as marital, not separate. Using this characterization, we calculate the total marital liabilities at $87,533.12, the net estate at $268,119.17, Darren's share of the total estate at 47.5% and Teresa's share of the marital estate at 52.5%.[33] Insofar as Teresa is arguing that the superior court mischaracterized the disputed debts as her separate property, we find no error because the court did not in fact characterize them as her separate property.

■ Teresa also seems to make another argument about the debt. According to Teresa, credit records would have provided clear evidence that the disputed debts should not be assigned to her. She argues that she did not have access to these records because Darren kept them locked in his house, and that because she was pro se, she did not know how to obtain these documents through discovery. Thus, we take her argument to be that the superior court had a duty to inform her of discovery procedures, and that its breach of this duty was the direct cause of the debts' mischaracterization. We disagree.

---

**32.** The superior court acknowledged: "Although [Teresa] testified at trial as to what these debts were for, she stated that these debts were in her name alone. She did claim that some of them were incurred for marital expenses. Teresa did not provide any documentation showing how, when, or why such debts were incurred and she failed and refused to attend her deposition."

**33.** While the superior court's findings state that the marital debt assigned to Darren was $31,411, on the distribution spreadsheet the number intended to represent this same sum reads $21,661.39. Although this subtotal, as it appears

on the spreadsheet, is clearly incorrect, the amounts representing the individual items of marital debt on the spreadsheet are correct, and when added together, give rise to the value stated in the superior court's findings of fact. Thus, this error is harmless. A similar typographical error appears in the spreadsheet cell listing total marital liabilities; it reads $77,783.85, whereas the properly calculated sum is $87,533.12. This error is harmless because, as explained further in the text, the superior court's property division was equitable.

As a preliminary matter, even accepting the facts as Teresa states them on appeal (i.e., that Darren kept the original credit records locked in his house), she does not explain why she could not have obtained duplicate records from her creditors. As Darren points out, even if the superior court did have a duty to help Teresa obtain the documents from Darren, it is not clear how its breach of this duty would have been a but-or cause of Teresa's failure to substantiate her claims in court—presumably, she could have obtained copies of the records directly from her creditors to substantiate her claims. If the debts were in fact mischaracterized due to a lack of documentary evidence in support of Teresa's position, it was the result of Teresa's failure to act, not of the court's failure to walk her through the discovery process.

■ In any case, the superior court did not have a duty to help Teresa obtain her credit records from Darren. We held in *Kaiser v. Sakata*[34] that when a pro se litigant does not make a good faith effort to obtain discovery or to inform the court of her difficulties in obtaining discovery, a trial court is not obligated to assist her in requesting or moving to compel discovery.[35] This holding applies to the present case. There is nothing in the record indicating that Teresa ever requested the credit records from Darren [36] or that she had any difficulty obtaining duplicate records from her creditors. There is also nothing in the record to indicate that Teresa alerted the trial court to her desire for these documents or to any attempts—failed or otherwise—that she made to obtain them. Therefore, consistent with our holding in *Kaiser*, we hold that the superior court had no duty to Teresa with regard to discovery of her credit records.

**34.** 40 P.3d 800 (Alaska 2002).

**35.** *Id.* at 804.

**36.** When testifying at trial as to the nature of the disputed debts, Teresa made no mention of her alleged attempts to retrieve the credit records from Darren. If she had wanted to bring her claim of difficulty in obtaining the documents to the trial judge's attention, this would have been an opportune time to do so; yet, she made no mention of it.

### 5. Antiques/household furnishings

■ The superior court valued the entire collection of antique furniture at $60,000, finding that $45,000 of the collection was marital. Teresa argues that the superior court abused its discretion by finding that only $15,000 of the antique furniture was her separate property. But she has failed to brief this issue adequately, citing no legal authority. In these circumstances, even when pro se litigants are involved, we have declined to consider the argument.[37]

### B. Valuation

Teresa also argues that the superior court clearly erred in valuing several of the marital assets. After a close examination of the record, we affirm the superior court's valuations.

### 1. Teresa's civil service retirement

■ Teresa argues that the court clearly erred in adopting Darren's valuation of her retirement because his valuation was based on an expert's estimate rather than on her retirement's actual value. Although Teresa did not provide proof of her retirement's actual value in discovery or at trial, she argues that she did give Darren's lawyer power of attorney to access her retirement records. We understand her to be asserting that because Darren had access to her records, the court was obligated to use those records as the basis for its valuation, rather than the expert report that Darren submitted at trial. We hold that the superior court's reliance on Darren's expert report was not error.

In discovery, Darren requested several times that Teresa provide proof of her retire-

**37.** *See A.H. v. W.P.*, 896 P.2d 240, 243 (Alaska 1995) (even when pro se litigant is involved, argument is waived when party "provides no citation of legal authority" and fails to provide legal theory for her argument). *See also Gates v. City of Tenakee Springs*, 822 P.2d 455, 460 (Alaska 1991) (matters addressed "only cursorily" by pro se litigant treated as abandoned by supreme court).

ment's actual value. Teresa never provided this proof, even after the court issued an order to compel discovery. She also refused to attend the deposition where she was to testify about the value of her retirement. Teresa stated in discovery and her trial brief that she gave Darren's lawyer power of attorney so that he could access her retirement records, but proof of this power of attorney does not appear anywhere in the record. At trial, Darren presented expert Edwin Schilling's report, which estimated the value of the marital portion of Teresa's retirement to be $139,532. Although Teresa questioned the accuracy of the expert's estimate in her trial testimony, she did not offer an alternative valuation.

Teresa's failure to provide any proof of her retirement's true value both in discovery and at trial makes it difficult for her to challenge the court's findings now. Even if Teresa actually gave Darren's lawyer power of attorney to access her retirement records—an allegation for which she offers no proof—this would not have obligated Darren or the court to use these records in determining the retirement's value. If Teresa wanted the valuation to be based on the true value of her retirement, she should have provided proof of its true value in discovery and at trial.[38] Her failure to do so left the superior court with no alternative but to adopt the expert's estimate. Because the valuation of marital assets is reviewed for clear error[39] and the superior court's finding unquestionably had support in the record, we affirm the superior court's valuation of the marital portion of Teresa's retirement.

### 2. Darren's tools

■ Next, Teresa argues that even if the superior court did correctly include all of the tools acquired during the life of the marital community—as we have concluded it did—it grossly undervalued them.

As we discussed above, the superior court adopted Darren's valuation of the tools, which he had based on his own receipts and the opinions of professional tool dealers. While Teresa also offered valuations of the tools at several points in the record, her estimates varied greatly from one valuation to the next: from $20,000 to $30,000, to well over $60,000. She did not explain why the valuations varied so dramatically. Thus, while Darren offered a single consistent valuation, Teresa offered several different estimates, never acknowledging or explaining the differences among them.

A factual determination is clearly erroneous if it is unsupported by the record, or if we are left with a definite and firm conviction that a mistake has been made.[40] The superior court based its valuation on the estimate Darren had provided, which constitutes sufficient support in the record. Finding no clear error, we affirm the superior court's valuation.

### 3. The antiques/household furnishings

■ In addition to arguing that the superior court mischaracterized the marital portion of the antiques, Teresa suggests that the court clearly erred by overvaluing the collection at $60,000. On appeal, Teresa states that while all of the household furnishings together were worth $60,000, the antiques alone were worth only a fraction of that. After examining the record, we conclude that Teresa's argument arises out of her misunderstanding of the superior court's finding, and in fact, the superior court did adopt the valuation that she proposed.

At trial, Darren assigned a $60,000 value to a category of items that he labeled "Antique Furniture." On Teresa's asset spreadsheet and in her pretrial brief, she assigned the same value to a category of items she labeled "Household Furniture and Antiques." At no point did Teresa estimate the value of

---

**38.** In her reply brief, Teresa implies that she was not able to offer proof of the actual value of her retirement because the government sent the information to her old address. But this does not explain why she could not obtain a copy of her retirement records—she could have simply contacted the appropriate government office and told it to send the records to her new address.

**39.** *Krize v. Krize,* 145 P.3d 481, 487 (Alaska 2006).

**40.** *Moffitt v. Moffitt,* 749 P.2d 343, 348 (Alaska 1988).

the antiques alone. On appeal, Teresa argues that the superior court overvalued the "Antique Furniture" at $60,000, when that value actually applied to the entirety of household furniture.

While Teresa's objection appears to have merit at first glance, a closer look suggests that the superior court actually did adopt the valuation Teresa proposed at trial. In the court's findings of fact, "Antique Furniture" is the only category of household furnishings mentioned. In its distribution spreadsheet, no other furnishings are itemized, valued, or awarded. Thus, it does not appear that the superior court intended "Antique Furniture" to represent a subset of the home furnishings, as Teresa believes, but rather, the complete set of marital home furnishings, regardless of its truly antique character. It appears that the superior court used the "antique furniture" label but adopted Darren's undisputed testimony that "[e]verything in the house is antique except for the bed and computer desk." This undisputed testimony suggests that the category of assets Darren labeled "antique furniture" was essentially the same category of assets that Teresa labeled "Household Furniture and Antiques." The superior court's valuation of the "Antique Furniture" at $60,000 was, then, almost completely consistent with Teresa's valuation of the "Household Furniture and Antiques." As a result, we conclude that her argument on this point is misplaced. Moreover, because we review valuation for clear error,[41] and the court's valuation was at the very least supported by the estimate Darren provided, we affirm the superior court's valuation.

#### 4. The EMC motorhome

■ The superior court awarded the 1989 EMC motorhome to Teresa, valuing it as an asset worth $1,670.67. Teresa argues that the superior court clearly erred in its valuation by completely failing to consider the outstanding debt on the motorhome.

It is clear, however, that the superior court considered the outstanding debt in making its valuation. At trial, Darren estimated that the motorhome was worth $15,000, but that due to the outstanding $14,329.33 on the loan, the net value was a mere $670.67. In her testimony at trial, Teresa stated that she did not dispute Darren's estimation of the motorhome's net value, and agreed that given the outstanding loan, its net worth was approximately $600. Yet, in spite of her earlier testimony, Teresa now argues that the court's positive valuation of the motorhome indicates that it neglected to consider the outstanding debt. But the court's valuation of the motorhome at $1,670.67—many thousands of dollars less than the $15,000 market value that Darren estimated and Teresa did not dispute—indicates that the court did, in fact, consider that a significant amount of the loan remained unpaid. Thus, the superior court did not err in the way Teresa argues it did.[42]

#### 5. The Lake Louise property

■ Teresa states that although she agrees that the lots carry a gross value of $52,900—which is the combined assessed value of the lots—she believes that the cabin on lot 2 was undervalued, and asserts that the true value is closer to $40,000. We understand Teresa to be arguing that the court should have valued the cabin at more than the cost of the "cabin kit" because the cabin cost substantially more to build than the cost of the kit. Thus, she argues that the present value of the cabin is greater than simply the cost of the materials that went into it. She also points out that no appraisal of the prop-

---

41. *Krize,* 145 P.3d at 487.

42. The court may have erred in another manner. As stated above, Darren estimated that the motorhome was worth $15,000, but that due to an outstanding $14,329.33 on the loan used to purchased the motorhome, the net value of the vehicle was $670.67. But the superior court valued the motorhome at $1,670.67—exactly $1,000 in excess of the undisputed estimate. In the absence of any explanation for this higher value, the digital similarity between Darren's estimate and the superior court's valuation suggests typographical error. Nonetheless, because Teresa waived this argument by not raising it on appeal, we affirm the superior court's valuation. *See Gates v. City of Tenakee Springs,* 822 P.2d 455, 460 (Alaska 1991) (claims which were addressed in appellant's brief only cursorily or not addressed at all are deemed abandoned).

erty was done, and that Darren presented no evidence to the court supporting his valuation.

This argument might be persuasive if Teresa had presented any evidence at trial of the cabin's present value, but she did not. In fact, the asset spreadsheet she submitted as an exhibit at trial lists only the assessed value of the land and does not add any value for the cabin. Also, when questioned as to whether she agreed with the valuation of the lots at trial, she only responded "I agree completely with the valuation of the ... lots." Although it may be true that an assessment would have shown a higher present value for the cabin, Teresa waived this argument by failing to make it below or to present any conflicting valuation evidence.[43]

### 6. The Landingcraft boat

■ The superior court valued the couple's Landingcraft boat at $10,000 and awarded it to Darren. Teresa argues that the superior court clearly erred by severely undervaluing the boat, and that it should have been valued at close to $35,000. After examining the record, we conclude that the superior court did not clearly err.

On his asset spreadsheet, Darren valued the Landingcraft at $10,000. In her response to Darren's first request for production, Teresa valued the Landingcraft at $30,000. Then, in her reply to Darren's trial brief, she stated that Darren had "completely undervalued" the Landingcraft when he said it was worth $10,000, estimating that "[i]f it was sold tomorrow it would sell for at least $80,000." But the last valuation Teresa submitted to the court appeared to adopt Darren's valuation, stating the Landingcraft was worth $10,000. When the trial judge asked Teresa if she disputed Darren's valuation of any of the boats, Teresa made no mention of the Landingcraft, once again implying that she agreed with Darren's valuation.

We review the valuation of marital assets for clear error.[44] Because the superior court's valuation was supported by both Darren and Teresa's testimony, we hold that the superior court did not clearly err in valuing the Landingcraft at $10,000.

### C. Equitable Distribution

Teresa also argues that the superior court acted inconsistently with the principles of equitable distribution set out by AS 25.24.160(a)(4) in deciding how to allocate the marital estate. We conclude that the superior court did not abuse its discretion in making its allocation determinations.

### 1. The EMC motorhome

■ Teresa suggests that the superior court acted inconsistently with the principles of equitable division when it awarded the motorhome to her, rather than Darren. She argues that it is clearly unjust for her to bear the burden of the motorhome's outstanding debt when her financial situation makes it impossible for her to make payments.

Alaska's divorce statute provides that the division of property must fairly allocate the economic effect of divorce, considering numerous factors.[45] We review the equitable allocation of property under an abuse of discretion standard[46] and will not reverse un-

---

**43.** *See D.H. Blattner & Sons, Inc. v. N.M. Rothschild & Sons, Ltd.,* 55 P.3d 37, 54 n. 69 (Alaska 2002) (issues not raised in trial court are waived on appeal except where plain error has occurred).

**44.** *Krize,* 145 P.3d at 487.

**45.** AS 25.24.160(a)(4). These factors include:

(A) the length of the marriage and station in life of the parties during the marriage;
(B) the age and health of the parties;
(C) the earning capacity of the parties, ...
(D) the financial condition of the parties, ...

(E) the conduct of the parties, including whether there has been unreasonable depletion of marital assets;
(F) the desirability of awarding the family home, ...
(G) the circumstances and necessities of each party;
(H) the time and manner of acquisition of the property in question; and
(I) the income-producing capacity of the property and the value of the property at the time of division.

**46.** *Dragseth v. Dragseth,* 210 P.3d 1206, 1208 (Alaska 2009).

less the division is clearly unjust.[47]

Although it is clear from her briefing that Teresa is confused on this point, the motorhome is not a liability, but an asset. Even if it is actually worth $1,000 less than the superior court found, which may be the case,[48] the motorhome still has a positive net value. Even if she now disagrees with her earlier testimony that the motorhome has a positive net value, by explicitly testifying at trial that she did not dispute Darren's valuation and never revising this statement, she waived her right to raise this issue on appeal.[49] There is nothing in the record to indicate how awarding the motorhome to Teresa makes her financial situation more dire. If Teresa is unable to make further payments on the loan, she can re-sell the motorhome; she need not be burdened with paying the remaining debt. Therefore, we hold that the superior court did not abuse its discretion in awarding Teresa the motorhome.

## 2. The Grayling boat

■ Next, Teresa argues that the superior court abused its discretion in awarding the Grayling boat to Darren. Darren responds that, in accordance with the law of equitable division, the court properly considered the needs of the parties—and specifically, Darren's need for the Grayling in his water taxi business—in awarding the Grayling to Darren. We agree with Darren and affirm the superior court's decision.

Throughout the proceedings, each party presented reasons why it should be awarded the Grayling. In her response to interrogatories, Teresa stated that she wanted the boat because she had an opportunity to use it for employment. However, in her reply to Darren's trial brief, she stated that she wanted the Grayling because she planned to live on Lake Louise, and would "need a large boat to travel safely on such a large body of water." When Teresa testified at trial, the judge told her that he needed to know why she wanted the Grayling so he could take her reasons into account when making a fair and equitable allocation of the assets. Teresa simply responded: "Because out of the five boats, that is the one that I want. [To p]ut it bluntly." At no point during the trial did Teresa reiterate or elaborate upon any plans to use the Grayling in business.

Darren, on the other hand, provided the superior court with a detailed account of his intentions to use the Grayling in the water taxi business he was planning to run on Lake Louise. In his pretrial brief, Darren stated that prior to the separation, he had begun taking steps toward establishing a water taxi and freighting business. In his trial testimony, both Darren and Teresa explained that the Grayling was purchased for use in that business. At trial, Darren testified that he still intended to use the Grayling in running the water taxi business and that he already had an agreement with Hope Cottage to run their tours. In its findings, the superior court made clear that Darren's professional need for the Grayling was the central factor in its decision to award the boat to him, rather than to Teresa.

Under AS 25.24.160(a)(4)(G), in deciding how to equitably allocate property, the superior court considers a variety of factors, including the "circumstances and necessities of each party."[50] In awarding the boat to Darren, the court appears to have determined that Darren's professional demands outweighed Teresa's transportational needs. There is nothing in the record to indicate that the court abused its discretion or that the allocation of the Grayling to Darren was clearly unjust. Therefore, we affirm the superior court's decision.

## 3. Overall distribution

■ Finally, Teresa argues that the superior court abused its discretion in its overall distribution of the marital estate. Specifi-

47. *Harrelson v. Harrelson,* 932 P.2d 247, 250 (Alaska 1997).

48. *See supra* note 41.

49. *See D.H. Blattner & Sons, Inc. v. N.M. Rothschild & Sons, Ltd.,* 55 P.3d 37, 54 n. 69 (Alaska 2002) (issues not raised in trial court are waived on appeal except where plain error has occurred).

50. AS 25.24.160(a)(4).

cally, she argues that her strained financial circumstances and Darren's relative financial security render the court's decision to award her only 51%[51] of the net assets clearly unjust. In presenting this argument, Teresa emphasizes that she lost her job due to medical reasons, implying that the role her injuries continue to play in her unemployment warranted a greater division of the assets in her favor.

Alaska courts favor an equal, 50/50 division of marital property, and such a division is presumptively valid.[52] Teresa is correct that the factors the court must consider in dividing the marital estate under AS 25.24.160(a)(4) include the station in life of the parties during marriage, the age and health of the parties, the earning capacity of the parties, and the financial condition of the parties. But although the facts as Teresa states them on appeal may have warranted awarding her a greater share of the marital assets under the statute, Teresa failed to offer this evidence before the superior court and never argued that she should be awarded more than 50% of the marital estate in the proceedings below.

Teresa did state in her trial brief that she had to leave work in August 2005 "due to injuries received at work," but at no point in the record did she suggest that these injuries continued to prevent her from finding employment. In fact, Teresa stated at least three separate times during discovery that, while she was dealing with a short-term ankle injury, she did *not* have a disease or mental defect that would affect her ability to earn a living in the foreseeable future; she implied that she would be able to work again as soon as the injury healed. Although Teresa did briefly testify to the fact that she was currently unemployed, she did not suggest that she would be unable to find a job in the future. Rather, her testimony that she had experienced brief intermittent periods of unemployment in the past suggested that her current situation was not out of the ordinary and that she was likely to find employment in the near future. Finally, while Teresa now

states that Darren makes over $70,000 a year, she presented no evidence of his current income at trial—in fact, she testified that Darren also experienced an extended period of unemployment as recently as 2005.

Because our review is restricted to the facts in the record, we cannot say that the superior court's decision to award Teresa 52.5% of the estate was clearly unjust. While she did inform the court that she was currently unemployed, she did not present any evidence suggesting that Darren was in a significantly better financial situation, nor did she indicate that she expected her unemployment to continue indefinitely. Therefore, we affirm the superior court's overall division of the marital estate.

### D. Other Issues

Finally, Teresa raises several issues on appeal that do not directly relate to the three-step property division process. We conclude that none of these issues warrants a remand.

#### 1. The house

Teresa argues that the superior court erred in finding her responsible for the marital home going into foreclosure. It is unclear what relief Teresa seeks, even if we were to agree with her. The house went to Darren in the property distribution, but because Teresa had already quitclaimed the house to Darren, he would have been awarded the house regardless. In any case, there is no reason to believe that the court clearly erred in making this finding. Teresa testified that the mortgage holder told her that she did not have to pay the mortgage payments because it was in "work out." She argued that Darren did not send her enough money to pay the mortgage, and that she could not pay the mortgage because she was experiencing a period of unemployment due to injury. But Darren testified that he sent her three to four thousand dollars a month during that time period to pay bills, and that she simply failed to pay the mortgage. Be-

---

**51.** We have calculated the percentage awarded to Teresa by the court to be 52.5%. *See supra* note 32 and accompanying text.

**52.** *Elliott v. James,* 977 P.2d 727, 730 (Alaska 1999).

cause it is within the superior court's discretion to judge the credibility of witnesses,[53] we hold that the superior court did not clearly err in finding Teresa responsible for the marital home going into foreclosure.

### 2. $4,500

Teresa's argument concerning the $4,500 is not entirely clear, but we take her to be arguing that she should not have been credited with the $4,500 the superior court found she withdrew from one of the parties' joint accounts. In fact, it does not appear that the trial court actually did attribute those funds to her. Therefore, we conclude that her argument is based on a misunderstanding of the superior court's findings. Accordingly, we affirm.

### 3. Teresa's deposition

Finally, Teresa seems to offer two distinct arguments with respect to her deposition. First, she argues that the superior court erred by not compelling her to testify at her deposition. Second, and somewhat inconsistently, she argues that because her appearance at the deposition would have been futile, unnecessary, and burdensome, she should not have had to attend, and consequently, it was improper for the court to consider her failure to attend in making its findings.

We review the trial court's procedural decisions for abuse of discretion.[54] With respect to Teresa's first argument, we hold that the superior court did not abuse its discretion. Contrary to Teresa's argument on appeal, the superior court attempted to compel her to attend the deposition when it issued a subpoena duces tecum. According to the superior court's findings—which Teresa does not dispute on appeal—she "refused" to attend. Thus, as Darren argues, it is difficult to determine what Teresa believes the superior court should have done differently. The superior court did what it could to compel her attendance by issuing the sub-

poena. The superior court did not abuse its discretion.

We are also unpersuaded by Teresa's second argument that the superior court erred by taking her failure to attend the deposition into account when making its findings concerning disputed debts. It is within the trial court's discretion to judge the credibility of witnesses and to weigh conflicting evidence.[55] The trial court decides matters of credibility on a case-by-case basis and considers all the relevant circumstances including the demeanor of the witnesses and conflicting testimony.[56] Her failure to attend the deposition where she was to be questioned about the disputed debts left the court with little evidence supporting her position. Moreover, a witness's refusal to attend the deposition in which she was to defend her otherwise unsubstantiated claims is a circumstance that is highly relevant to her credibility as a witness. Therefore, we conclude that the superior court did not abuse its discretion in its handling of Teresa's deposition.

## V. CONCLUSION

We AFFIRM the judgment of the superior court in all respects.

EASTAUGH, Justice, not participating.

CHRISTEN, Justice, dissenting.

CHRISTEN, Justice, dissenting in part.

Because the superior court did not make findings explaining why it treated Teresa's separate property as marital, I respectfully dissent from the portion of the court's decision that affirms the characterization of Teresa's pre-marital retirement benefit.

As the court's decision acknowledges, "the general rule is that courts divide property 'acquired only during the marriage.'" But today's decision concludes that, in this case, the superior court "had discretion to include in the marital estate property that was acquired during [a] period of premarital cohabi-

**53.** *Pam R. v. State, Dep't of Health & Soc. Servs.,* 185 P.3d 67, 71 (Alaska 2008).

**54.** *Clemensen v. Providence Alaska Med. Ctr.,* 203 P.3d 1148, 1151 (Alaska 2009).

**55.** *Pam R.,* 185 P.3d at 71 (Alaska 2008).

**56.** *McDanold v. McDanold,* 718 P.2d 467, 469 (Alaska 1986).

tation." I agree that the superior court has some discretion to characterize property acquired before marriage as marital property, but that discretion is not unfettered. Here, the superior court neglected to apply the statutory presumption that pre-marital property is separate property and made no findings to suggest that its invasion of pre-marital property was warranted by a "balancing of the equities." This was contrary to our case law and AS 25.24.160.

We have long applied the rule that "one spouse's separate property ... should not be deemed a marital asset available for division unless the court *specifically finds* that a balancing of the equities between the parties requires invasion of the premarital holding." [1] Without such a finding, a superior court does not have the discretion to invade pre-marital assets. [2] We applied this rule to property acquired by one spouse during a period of pre-marital cohabitation in *Murray v. Murray*, where we determined that the superior court must "assess whether the equities require invasion of separate assets under AS 25.24.160(a)(4); and if so ... *enter explicit findings to that effect.*" [3] This case law is faithful to the plain language of AS 25.24.160(a)(4), which only permits a superior court to "invade the property ... of either spouse acquired before marriage when the balancing of the equities between the parties requires it."

Our ruling in *Faulkner v. Goldfuss*[4] was also consistent with this rule of law. Today's

decision implies that *Faulkner* somehow dispensed with the requirement that the superior court expressly balance the equities before invading pre-marital property, but nowhere in *Faulkner* did we explicitly or implicitly overrule *Murray*. *Faulkner* quoted *Murray* for the proposition that "the trial court is free to consider the parties' entire relationship, including any period(s) of premarital cohabitation," [5] and upheld the superior court's determination that a retirement benefit earned during pre-marital cohabitation was marital property. [6] *Faulkner* did not specifically state that the superior court had balanced the equities before invading pre-marital property, but nothing in the opinion suggests that we intended to abrogate the longstanding rule established by the statute and our case law.

We have applied and expressly reaffirmed this rule in multiple decisions since *Faulkner*. For example, in *Chase v. Chase* we upheld the superior court's characterization of assets acquired during pre-marital cohabitation as marital property because the superior court made specific findings supporting its invasion of separate property. [7] The superior court identified equitable considerations—such as the use of a pre-marital piece of property as the family home and one spouse's unpaid work in the home—to justify its invasion of pre-marital property; we affirmed this invasion "[b]ecause the decision to categorize the property as marital [was] sufficiently supported by the superior court's

---

**1.** *Brooks v. Brooks*, 733 P.2d 1044, 1053 (Alaska 1987) (quoting *Carlson v. Carlson*, 722 P.2d 222, 224 (Alaska 1986)) (emphasis added) (internal quotation marks omitted); *see also Harrelson v. Harrelson*, 932 P.2d 247, 250–51 (Alaska 1997) (remanding superior court's characterization of pre-marital property as marital because court did not make "the proper property distinction mandated by *Murray* and AS 25.24.160(a)(4)."); *Cox v. Cox*, 882 P.2d 909, 915 (Alaska 1994) (remanding because superior court's findings failed to adequately distinguish between pre-marital and marital property); *Rhodes v. Rhodes*, 867 P.2d 802, 804–05 (Alaska 1994) (remanding because superior court did not make "adequate findings on whether [disputed property was] marital or separate property."); *Murray v. Murray*, 788 P.2d 41, 42 (Alaska 1990) (requiring "explicit finding" that balancing of equity favors division of pre-marital property).

**2.** *Brooks*, 733 P.2d at 1053.

**3.** 788 P.2d at 42 (emphasis added); *see also Harrelson*, 932 P.2d at 250–51 (remanding superior court's unexplained characterization of property acquired during pre-marital cohabitation as marital property).

**4.** 46 P.3d 993 (Alaska 2002).

**5.** *Id.* at 1002–03 (quoting *Murray*, 788 P.2d at 42).

**6.** *Id.*

**7.** 109 P.3d 942, 947–49 (Alaska 2005).

findings...."[8] Our decision in *Chase* demonstrates that while "a 'talismanic' reference to *Murray* or a 'formalistic invocation' of particular language" is not required,[9] we do require *some* findings demonstrating the propriety of invading pre-marital property.[10] We have also explicitly affirmed this rule, as applied to pre-marital property generally,[11] in multiple cases subsequent to *Faulkner*.[12]

It is not disputed that ten years of Teresa's retirement benefit accrued after the parties began living together, but today's decision states "[t]he superior court characterized the portion of Teresa's civil service retirement that she earned in the ten years of cohabitation preceding the couple's legal marriage as part of the marital estate." In fact, the superior court did not find that marital property began to accrue ten years before the parties married (when Teresa's divorce from her previous husband became final). Nor did the court explain why it might have been appropriate to deem assets acquired after that date to be marital. Instead, the superior court's findings reflect that it adopted Darren's expert's *valuation* of Teresa's retirement. Not surprisingly,

Darren's expert valued Teresa's retirement in the way that was most favorable to Darren: he assumed that the marital estate began to accrue immediately after Teresa's divorce from her previous husband became final. The superior court adopted the following finding from Darren's proposed findings of fact:

> The marital portion of her retirement has been calculated to be worth $139,532. *This valuation is based upon the assumption that the marital interest in such retirement started accruing on July 1, 1989 when the parties were living together.* Teresa agreed to the valuation of her retirement.[13]

The assumption made by Darren's expert was not consistent with Alaska law; it was consistent with the valuation of the marital portion of Teresa's asset in a way that was most beneficial to Darren. Tellingly, even Darren does not argue that the superior court found the marital estate began to accrue once the parties began living together. Darren argued on appeal that the superior court's characterization of this asset was either a sanction for Teresa's failure to attend

8. *Id.* at 947.

9. *Harrelson*, 932 P.2d at 251 n. 5.

10. *Chase*, 109 P.3d at 947–48 (identifying trial court findings on equitable considerations); *see also Abood v. Abood*, 119 P.3d 980, 988 (Alaska 2005) (citing *Murray* and ruling that superior court could properly consider period of pre-marital cohabitation "as long as the trial court recognized that the home was originally ... separate property"). Today's decision cites *Faulkner* for the proposition that we do not require "explicit factual findings about either (1) the parties' intent to treat the property as marital or (2) the need to treat the property as marital in order to do equity." But as noted, our case law does not establish a rule requiring enumerated factors to be explicitly considered or specific language to be invoked. *Harrelson*, 932 P.2d at 251 n. 5. What we do require is that the superior court acknowledge that it is invading separate property and make findings of fact to support the invasion. *See Abood*, 119 P.3d at 988. *Faulkner* did not dispense with this requirement.

11. To the extent that today's decision draws a distinction between separate property acquired during pre-marital cohabitation and all other pre-marital separate property, I find this distinction unpersuasive. Alaska does not recognize

common law marriage, and Alaska law is not premised on the assumption that all property acquired during pre-marital cohabitation should be considered marital property. Like other property acquired by one spouse prior to marriage, property acquired during pre-marital cohabitation is presumptively separate property; it may be characterized as marital property, but only if the superior court makes findings justifying the invasion. *Murray*, 788 P.2d at 42. Neither the statute nor the case law singles out separate property acquired during cohabitation as unique, and today's decision does not articulate why it should be treated any differently.

12. *See, e.g., Barnett v. Barnett*, 238 P.3d 594, 600 (Alaska 2010) ("property acquired before the marriage ... should not be treated as part of the marital estate ... unless the court specifically finds that balancing of the equities requires invasion of the premarital holding."); *Rodvik v. Rodvik*, 151 P.3d 338, 350 (Alaska 2006) (noting that "a decision to invade separate property must be accompanied by specific findings justifying the invasion."); *Odom v. Odom*, 141 P.3d 324, 340 (Alaska 2006) ("decision to invade separate property may be undertaken only after the trial court has attempted to use the marital estate to balance the equities") (internal quotations omitted).

13. Emphasis added.

her deposition, or that the inclusion of the pre-marital portion of Teresa's retirement was justifiable because Teresa caused a dissipation of the marital estate by allowing the parties' home to go into foreclosure or by failing to winterize the parties' motor home. None of these theories withstand scrutiny. The superior court did not find that Teresa dissipated the marital estate; it made no findings or conclusions that suggest it intended to sanction Teresa by invading her separate property; and it did not make any findings about responsibility for the marital home going into foreclosure. The superior court simply treated Teresa's pre-marital asset as a marital asset. No balancing of the equities took place; no explanation was provided for the invasion of Teresa's pre-marital property.

Today's decision speculates that the superior court relied on testimony describing the parties' pre-marital cohabitation to treat Teresa's separate property as marital, and asserts that this testimony supports the superior court's "implicit finding" that the balancing of the equities justified invading Teresa's retirement. But it is not this court's role to guess a superior court's reasons for invading pre-marital property.[14] The *Murray* rule provided us with a clear record on appeal setting out the equitable considerations supporting a superior court's invasion of pre-marital property.[15] In contrast, today's decision speculates that the superior court considered testimony regarding the character of the parties' pre-marital cohabitation; we have no substantive indication that the court in fact relied on this testimony in invading pre-marital property. And if the superior

court instead determined that separate property acquired during pre-marital cohabitation was presumptively marital, it abused its discretion. We have no way of knowing which of these rationales motivated the superior court's characterization, and this uncertainty frustrates effective appellate review.[16]

Another troubling consequence of the decision issued today is that it gives no guidance to litigants, practitioners, or superior court judges about when pre-marital assets may be invaded. In my view, it is inherently unfair to leave litigants guessing about what ground rules will be applied by the superior court when marital assets are divided. Experience tells us that uncertainty about the law hinders settlement efforts and increases litigation costs.

Because the superior court's findings suggest that the statutory presumption regarding pre-marital property was reversed in this case, and because the findings give no indication of why Teresa's pre-marital retirement was treated as a marital asset, I would reverse this part of the superior court's decision and remand for additional findings on the propriety of invading Teresa's pre-marital retirement benefit.

---

14. See *Borchgrevink v. Borchgrevink*, 941 P.2d 132, 143 (Alaska 1997) ("[T]he role of the appellate court in the judge-tried case is to review only what the trial court has found, not what the trial court might have found.").

15. *Murray*, 788 P.2d at 42.

16. Our case law reveals that the failure to distinguish between cohabitation and marriage can derail appellate review, causing unnecessary expense and delay for the parties. In *Harrelson v. Harrelson*, we remanded for additional findings of fact because the superior court committed clear error by finding that the parties had been married for eight years, a period that included a few years during which they were merely cohabi-

tants. 932 P.2d 247, 250–51 (Alaska 1997). We noted that the superior court had the discretion to consider the parties' pre-marital cohabitation, but we reversed its decision "because it [was] unclear to what extent the court's treatment of the duration of the marriage influenced the property division." *Id.* at 251. We elaborated that while we do not require "a 'talismanic reference' to *Murray* or a 'formalistic invocation' of particular language," we must be provided with a record that allows for accurate appellate review. *Id.* at 251 n. 5. Today's decision blurs the line between assets acquired during pre-marital cohabitation and assets acquired during marriage, adding confusion to the already-difficult process of characterizing and valuing marital estates.