**Ernest M. CHASE, Appellant,**

v.

**Judy A. CHASE, Appellee.**

No. S–11447.

Supreme Court of Alaska.

April 1, 2005.

37. 5 AAC 15.359(d).

Charles J. Gunther, Law Office of Charles J. Gunther, Anchorage, for Appellant.

Sarah J. Tugman, Anchorage, for Appellee.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

*OPINION*

FABE, Justice.

## I. INTRODUCTION

Judy and Ernest Chase began living together in 1986. They had three children before marrying in 1996. The couple divorced in 2004. The court granted sole physical custody of the couple's youngest son to Judy. The court also characterized certain pieces of property as marital property for purposes of distribution. Ernest Chase appeals these custody and property determinations. Because the superior court did not abuse its discretion, we affirm the superior court's custody decision and property division.

## II. FACTS AND PROCEEDINGS

### A. Custody

Judy and Ernest Chase met in February of 1986 when Judy was sixteen years old and Ernest was forty-one. Judy dropped out of high school after meeting Ernest and moved

in with Ernest in June 1986.[1] The couple lived in a rented house in Anvik. Their first child, Charity, was born on July 14, 1987. Their second child, Chastity, was born on January 19, 1989. Their youngest child, Cody, was born on August 13, 1994. Judy and Ernest married on February 14, 1996.

Judy and Ernest lived together until June 1998, when Ernest was incarcerated for growing marijuana.[2] Prior to his incarceration, Ernest worked in gold mining, fishing, hauling fish eggs, and as a pilot. Aside from helping Ernest occasionally, Judy did not work outside the home. Judy was the primary caregiver for the children.

When Ernest went to prison, the family home was seized and forfeited, and Judy and the children moved into a mobile home. Judy began to abuse alcohol and her relationship with her children deteriorated. At the divorce trial, Judy testified that her life "f[e]ll apart" while Ernest was in prison. A family friend arranged for the children to live during this time with the Riggs family, who were acquaintances of the Chases. The children stayed with the Riggs family from August 1999 through June 2002. Judy testified that although she did not visit the children when they first went to live with the Riggs family, after six months had passed she began to visit them frequently and occasionally spent the night. She also testified that she talked to them regularly on the phone throughout their stay.

Ernest was released from prison in December 2001 and stayed in a transitional facility until March 2002. In June 2002 Cody went to live with Judy and spent most weekends with Ernest. Charity and Chastity went to live with Ernest. Judy filed for divorce on June 12, 2002 and sought legal and primary physical custody of the children.

During the custody proceedings, a state custody investigator prepared a custody investigation report for the court. The report included custody and visitation recommendations. The investigator conducted interviews with Judy, Ernest, the three children, and

Cody's teacher. All three children expressed a desire to live with their father. The girls attributed this preference to their mother's drinking. Citing Judy's alcohol abuse, the investigator recommended that sole legal and primary physical custody of all three children be granted to Ernest. The investigator also recommended limiting Judy to daytime visits "until she completes a substance abuse assessment and follows the treatment suggested by the provider."

After receiving the custody investigator's report, Judy voluntarily underwent an alcohol assessment. Based on a review of Judy's driving record and urinalysis tests, the assessment concluded that Judy was not currently abusing alcohol and did not recommend any type of treatment. At the time of the trial, Judy had worked for several years, first at Cornell Corrections and then at Evergreen Aviation. Judy testified that both Cornell Corrections and Evergreen Aviation required drug and alcohol tests for employees and that she had always passed them.

Cody's report cards and testimony at the trial reflected that Cody was doing well in school while living with Judy. A friend of Judy's testified that on weekends when Cody stayed with Ernest, he was usually in the care of Charity and Chastity, and that Ernest did not provide much supervision for the children.

Superior Court Judge William F. Morse held a three-day bench trial beginning on November 4, 2003 to address the parties' custody and property claims. The superior court issued a decree of divorce on March 11, 2004 and awarded joint legal custody of all three children to both parents. Ernest received primary physical custody of Charity and Chastity. Judy received primary physical custody of Cody. The custody order incorporated by reference Judge Morse's oral findings articulated on the record on November 7, 2003. Ernest filed this appeal.

---

1. Judy received her GED in 1987.

2. Ernest contends that Judy participated in the growing operation but was not arrested because he covered for Judy so that she could care for the children while he was in prison.

## B. Property

The superior court also issued findings of fact and conclusions of law regarding the property to be divided between Ernest and Judy. Ernest appeals the superior court's characterization of a number of pieces of property as marital. Ernest does not appeal the court's valuation of the property. The properties that Ernest contends the superior court erroneously categorized as marital include a home and lot in Anvik, a cabin in Talkeetna, various mining equipment, a jet boat, a Cessna 206 airplane, and a Maule airplane and equipment. Each piece of property is discussed in Part III.C below.

## III. DISCUSSION

### A. Standard of Review

■ This court reviews the superior court's determination in child custody matters for abuse of discretion.[3] "An abuse of discretion is established if the superior court has considered improper factors in making its custody determination, has failed to consider statutorily mandated factors, or has assigned disproportionate weight to particular statutory factors while ignoring others."[4] The superior court's factual findings are re-

viewed under the clearly erroneous standard.[5]

■ We review the superior court's determination of what property is available for distribution in a divorce proceeding for abuse of discretion.[6] We disturb a trial court's findings that parties intended to treat property as marital only if they are clearly erroneous.[7] We review the superior court's equitable allocation of property for abuse of discretion and reverse if the trial court's allocation is "clearly unjust."[8]

### B. Custody of Cody

Ernest argues that the superior court abused its discretion by awarding primary physical custody of Cody to Judy despite the custody investigator's recommendation that Ernest should have primary physical custody of all three children. Ernest complains that the superior court simply ignored the custody investigator's report without explaining why the court chose to disregard the report. Ernest also argues that the court did not address adequately the factors required under AS 25.24.150,[9] making it impossible to determine the basis for the court's decision.

■ We have previously held that the trial court is not obligated to adopt a custody investigator's recommendations.[10] In *Evans*

---

3. *Faulkner v. Goldfuss*, 46 P.3d 993, 996 (Alaska 2002).

4. *Id.*

5. *Id.*

6. *Cox v. Cox*, 882 P.2d 909, 913 (Alaska 1994).

7. *Id.*

8. *Id.* at 914 (internal quotation marks omitted).

9. At the time of the trial, AS 25.24.150(c) provided that the court

   shall determine custody in accordance with the best interests of the child under AS 25.20.060–25.20.130. In determining the best interests of the child the court shall consider

   (1) the physical, emotional, mental, religious, and social needs of the child;

   (2) the capability and desire of each parent to meet these needs;

   (3) the child's preference if the child is of sufficient age and capacity to form a preference;

   (4) the love and affection existing between the child and each parent;

(5) the length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity;

(6) the desire and ability of each parent to allow an open and loving frequent relationship between the child and the other parent;

(7) any evidence of domestic violence, child abuse, or child neglect in the proposed custodial household or a history of violence between the parents;

(8) evidence that substance abuse by either parent or other members of the household directly affects the emotional or physical well-being of the child;

(9) other factors that the court considers pertinent.

10. *Evans v. Evans*, 869 P.2d 478, 480 (Alaska 1994) (upholding trial court's decision to grant custody to father even though custody investigator recommended granting custody to mother); *Nichols v. Mandelin*, 790 P.2d 1367, 1373 (Alaska 1990) (affirming trial court's decision to grant custody to mother even though trial court's decision contradicted custody investigator's recommendation that parents share custody); *see also Meier v. Cloud*, 34 P.3d 1274, 1277 (Alaska 2001) (holding that trial court did not err when it

v. *Evans*, we rejected the mother's claim that the trial court erred in failing to accord more credit to the testimony of the "neutral" custody investigator than that of other "biased" witnesses.[11] We reasoned that "the court ordinarily has no obligation to accept expert testimony when it finds other evidence more persuasive; nor is the court bound to favor the testimony of an ostensibly neutral witness who is unconvincing over that of a witness who testifies convincingly despite circumstances suggesting potential bias."[12] As our reasoning in *Evans* suggests, a custody investigator's report is just one of many pieces of evidence that is available to a trial court in the resolution of a custody dispute. As with other types of evidence, it is within the trial court's discretion to give the report the amount of weight the court deems appropriate. The trial court is under no obligation to make specific findings regarding the report as long as the court considers the appropriate statutory factors when making custody determinations.[13]

We therefore conclude that the superior court did not abuse its discretion in this case by reaching a decision that contradicted the custody investigator's recommendation or by declining to discuss the report explicitly. We next examine whether the superior court abused its discretion in its application of the statutory custody factors.

■ The superior court's oral findings indicate that the court weighed the relevant statutory custody factors outlined in AS 25.24.150. We have consistently held that "the trial court need not refer to all the statutory factors in explaining its custody decision. . . . In other words, '[e]xpress mention of each factor is not required.' "[14] Here, the superior court's oral findings reflect that the court did weigh the relevant factors, even if it did not explicitly refer to the statute when doing so.

For instance, the superior court considered the physical, emotional, mental, religious, and social needs of the children, as well as the capability and desire of each parent to meet those needs,[15] when it examined Judy's decision to leave the children with the Riggs family. The custody investigator had characterized this decision as evidence that "Mother failed to provide for the children during Father's incarceration." The superior court judge disagreed, remarking that the decision that "was probably the hardest to make but showed a strength of character at some level was [Judy's] decision to let the Riggs take the children. I think . . . that shows [that she was] putting [the] children first. . . ."

The superior court also considered the impact of substance abuse on the children.[16] The trial court found that Judy did abuse alcohol while Ernest was in jail but concluded that Judy had resolved her problems with alcohol. Similarly, the superior court considered the parties' willingness to foster an open relationship between the children and the other parent.[17] In setting up a visitation schedule, the trial court observed that Er-

---

declined to appoint custody investigator even though both parents initially requested one).

**11.** 869 P.2d at 480.

**12.** *Id.* In the current case, the custody investigator did not testify but her report was admitted as evidence.

**13.** In this respect a custody investigator's report resembles that of a guardian ad litem. *See Elliott v. Settje*, 27 P.3d 317, 322 (Alaska 2001) (upholding decision where trial court did not follow guardian ad litem's recommendation); *Rooney v. Rooney*, 914 P.2d 212, 219 (Alaska 1996) (stating that "[t]he superior court is not required to follow the [guardian ad litem's] recommendation. So long as the superior court's reasons for rejecting the custody investigation are not clearly erroneous, the superior court

does not abuse its discretion."). In contrast, the factual findings of a standing master are binding upon the court unless clearly erroneous, as stated in Alaska Civil Rule 53(d)(2). *Cf. Headlough v. Headlough*, 639 P.2d 1010, 1012 (Alaska 1982) (noting that master's factual findings are binding unless clearly erroneous under Civil Rule 53(d)(2), but that master's recommendation as to proper course of action is not binding upon court).

**14.** *Virgin v. Virgin*, 990 P.2d 1040, 1045 (Alaska 1999) (quoting *Park v. Park*, 986 P.2d 205, 207 (Alaska 1999)).

**15.** AS 25.24.150(c)(1) and (2).

**16.** AS 25.24.150(c)(8).

**17.** AS 25.24.150(c)(6).

nest had probably influenced the children's perception of Judy in a negative manner.

The superior court's comments indicate that the factor the court weighed most heavily was the need for stability and continuity in Cody's life.[18] In an exchange with Ernest, the trial judge noted, "it seems to me that [Ernest and Judy] have come to this arrangement regarding the children where, clearly, Cody is being shared back and forth. He seems to be doing fine and I don't see much reason to change that. . . ." In addition, when setting up a visitation schedule, the trial court considered the need for Cody to have meaningful relationships with his sisters.[19]

■ Because the superior court's consideration of the statutory factors can be discerned from its oral findings and from the record, we conclude that the superior court did not abuse its discretion when it granted sole physical custody of Cody to Judy.

### C. The Superior Court's Designation of Various Pieces of Property as Marital Property

Ernest claims that the superior court erred in finding that various pieces of property were marital property. Ernest's principal argument is that he acquired all of the items relevant to this appeal before the parties were legally married. Ernest also argues that the superior court did not explain why it categorized the property as marital property. Because the decision to categorize the property as marital is sufficiently supported by the superior court's findings and by the record, we affirm the superior court's findings regarding the property.

■ Property acquired by a couple prior to marriage may be considered marital property when the property was acquired during premarital cohabitation. "[S]o long as the parties do marry, the trial court is free to consider the parties' entire relationship, including any period(s) of premarital cohabitation, in making its property division under AS 25.24.160(a)(4), so long as the court observes the distinction which AS 25.24.160(a)(4) draws between assets acquired prior to and during coverture."[20] With the exception of the home in Anvik, Ernest does not claim that he acquired any of the properties before the parties began cohabiting in 1986. Implicit in the superior court's reasoning is the conclusion that the coverture period commenced when Judy and Ernest began living together in 1986.[21] Under the rule articulated in *Murray* and *Faulkner*, the superior court appropriately deemed these properties marital by virtue of the fact that the parties lived together and later married.[22] We discuss the trial court's

18. AS 25.24.150(c)(5).

19. Other relevant factors, such as the love and affection between Cody and his mother, were not in dispute. The child custody investigator found that Cody had a loving bond with his mother. The superior court did not consider Cody's preferences. Cody had stated to the child custody investigator that he preferred to live with his father, but the investigator noted that at seven years of age, "Cody is not mature enough to adequately consider the ramifications of a preference."

20. *Murray v. Murray*, 788 P.2d 41, 42 (Alaska 1990); *see also Faulkner*, 46 P.3d at 1003 (instructing trial court to adjust coverture period according to when couple began cohabiting). AS 25.24.160(a)(4) states that the court may provide

for the division between the parties of their property, including retirement benefits, whether joint or separate, acquired only during marriage, in a just manner and without regard to which of the parties is in fault; however, the court, in making the division, may invade the property, including retirement benefits, of either spouse acquired before marriage when the balancing of the equities between the parties requires it. . . .

21. The trial court's reasoning in this case could have been more clear. Under Alaska Civil Rule 52(a), "the court shall find the facts specifically and state separately its conclusions of law. . . ." This rule requires a trial court to provide the supreme court with "a clear understanding of the basis for the decision made" so that we may conduct a meaningful review of the court's decision-making process. *Crittell v. Bingo*, 36 P.3d 634, 639 (Alaska 2001) (internal citations and quotations omitted). While it is desirable for trial courts to make their reasoning more explicit than the court did in this case, the record is sufficiently detailed to allow for meaningful review of the decision.

22. *See Murray*, 788 P.2d at 42; *Faulkner*, 46 P.3d at 1003.

findings with respect to each of the properties below.

### 1. Anvik home and lot

The trial court determined that the Anvik house and lot were part of the marital estate and awarded them to Ernest. In his initial disclosures, Ernest stated that he acquired the house in Anvik in 1983. At the trial, Ernest testified that he agreed to buy the house from his nephew around 1978. Judy testified that she and Ernest had bought the house together in 1989 or 1990. According to Judy's testimony, the couple used the Anvik house as their permanent home although they spent winters in Anchorage. Judy testified that she rented out the house in Anvik while Ernest was in prison, listing herself as the owner.

The trial court did not make a determination about when the couple purchased the house; therefore, it is possible that Ernest purchased the house before the coverture period, which began when the couple began living together in 1986. But it does not matter whether Ernest purchased the house before the coverture period began, because the trial court noted that the couple remodeled the home and found that "[t]he parties lived in the home as a family."

In *Cox v. Cox*, we stated that "[s]eparate property becomes marital ... upon a showing that the parties intended to treat the property as marital." [23] Factors to be considered by a trial court in making this determination include: (1) the use of the property as the parties' personal residence, (2) the ongoing maintenance and management of the property by both parties, (3) placing the title of the property in joint ownership, and (4) whether the non-titled owner's credit has been used to improve the property.[24] It is not necessary for all four factors to be present in order for the court to find that the property was marital property.[25] Under the standard set forth in *Cox*, evidence that the couple had improved the home and lived in it together was sufficient

for the superior court to determine that the home was marital property, even accepting Ernest's contention that he acquired the home prior to the period of cohabitation.

### 2. Talkeetna cabin

The superior court determined that a cabin in Talkeetna used by the family for recreation was marital property and awarded it to Judy. Ernest claims that this home is not marital property because he began purchasing it in 1994 and had paid it off in full one month before he married Judy in 1996. Under the standard governing property acquired during premarital cohabitation that we articulated in *Murray* and *Faulkner*, the superior court did not err when it concluded that property acquired after the parties began living together in 1986 was marital property. This is true of the cabin in Talkeetna.

Moreover, Judy claims that the couple bought the cabin together and used it for recreation. She presented evidence at trial that she had paid taxes on the cabin in 1998. The superior court found that the family had used the Talkeetna cabin for recreation. The superior court also found that Judy and Ernest originally put the cabin in Cody's name and that Ernest had acted on Cody's behalf to quitclaim the cabin back to himself without Judy's knowledge in 2002. The superior court concluded that "[p]lacing [the cabin] in Cody's name was merely a convenience and a reflection that it was a family asset eventually to be passed on to the couple's children." These findings were supported by the record and were not clearly erroneous.

### 3. Mining equipment

A number of pieces of equipment from the family's gold mining endeavors are also in dispute. The superior court found that the family's interest in the mine itself did not have any value at the time of the trial, but that some of the equipment left at the mine did have value. The superior court categorized these pieces of equipment as marital property and awarded them to Ernest. Er-

---

**23.** 882 P.2d at 916.

**24.** *Id.*

**25.** *See id.* (listing factors and remanding to trial court to determine whether house was marital property, even though couple did not live in it).

nest contests the trial court's categorization of the properties as marital.

The superior court's determination that the mining equipment was marital property is supported by its finding that Judy raised the children while Ernest worked and that she sometimes assisted with the gold mine. The superior court wrote, "Judy was a superb mother. She raised the children. She did not work outside the home, although she provided some assistance to the men working at the gold mine when she and the children were on the site." The superior court concluded that Ernest's interest in the mining operation itself was a marital asset. Although the trial court's findings regarding the mining equipment were succinct, the trial court's determination regarding the mine itself supports its conclusion that the mining equipment was a marital asset as well.

More importantly, the superior court heard extensive and sometimes conflicting testimony about when and how the equipment was acquired, but Ernest does not claim that he bought any of the property prior to 1986. Therefore, the superior court properly deemed it marital under the premarital cohabitation standard set forth in *Murray* and *Faulkner*. Each piece of mining equipment is discussed briefly below.

### a. Case 750

Ernest claims that he purchased a Case 750 loader together with his brother in 1990 or 1991, before he married Judy. Ernest presented testimony from Judy's brother, who testified that he remembered seeing the loader at the mine in 1995 and 1996. Judy claims that the couple purchased the Case 750 in October 1996 and presented tax returns from 1996 indicating that the couple purchased it that year. Although the superior court did not determine when the Case 750 was purchased, it is clear that it was purchased sometime after the couple began living together in 1986.

### b. D–8 Caterpillar

Ernest claims that he purchased a D–8 Caterpillar in 1987. According to Ernest's

testimony at trial, the Caterpillar was in poor condition when Ernest bought it and he rebuilt it. Judy testified that the couple bought the Caterpillar at a state auction in Grayling. Again, because the Caterpillar was purchased after 1986, the superior court properly deemed it marital property.

### c. Nodwell

The Nodwell is a piece of equipment that the family used to haul fuel from the river. Ernest claims that he bought the Nodwell in Palmer in 1994. Judy testified that the couple bought it together and shipped it to the mine on a barge. As with the other pieces of mining equipment, there is no dispute that the Nodwell was purchased prior to 1986.

### d. Trommel

This piece of equipment was used to mine gold. Ernest testified that he purchased the trommel around 1988.[26] Judy claims that a photo of the trommel with their daughters in it when it was new indicates (because of the girls' ages) that the trommel was purchased after 1988. Because Ernest's own testimony indicated that he purchased the trommel sometime after 1986, the trial court properly categorized it as marital property.

### e. Hough Loader

Ernest testified that he purchased the Hough loader at a state auction in Umiat in 1987 or 1988 and that his brother paid to ship it to Nenana. The loader was used at the gold mine. Again, the trial court properly categorized the loader as marital property based on Ernest's own testimony that he bought it after 1986.

### 4. Jet boat

First Ernest testified that he bought the jet boat, but then testified that "we bought" this boat in 1993. Judy testified that they bought the jet boat in 1995 and that Ernest paid for it. Judy also testified that they improved the boat and used it for fishing as well as recreation. The superior court deter-

---

**26.** Ernest's testimony was that he purchased it "[i]n '80—'88 maybe?" Based on this testimony, Ernest claims in his brief that he purchased it between 1980 and 1988.

mined that the couple acquired the boat in 1993, well after the parties began cohabiting in 1986.

### 5. Cessna 206

Ernest testified that he purchased the Cessna in 1989 using funds he obtained from the sale of another plane and money that his brother contributed. He testified that he painted the plane and used it in his business hauling salmon eggs. Judy testified that she thought Ernest bought the plane in 1992 or 1993. She testified that "we all went and looked at it" before buying it, and that the couple had used the plane during their marriage. In its findings of fact, the superior court concluded that Ernest bought the plane in 1981 and concluded that it was a marital asset because the parties used it for "marital ventures." Judy claims that the finding regarding the year of purchase was a typographical error on the part of the superior court. We agree and conclude that the superior court's finding that Ernest bought the plane in 1981 was error because Ernest does not claim to have purchased the airplane before 1989. Because the Cessna was purchased after 1986 when the parties began living together, the superior court properly characterized the Cessna as marital property under either party's version of events.[27]

### 6. Maule and equipment

Ernest claims the Maule is non-marital property because he is the registered owner. Ernest testified that he acquired the plane in 1988 or 1989 when the previous owner told him he could have the plane if he would haul it away. Ernest testified that he did not pay anything for the airplane body but that his brother paid for the engine. Ernest also testified that he disassembled the plane to transport it on a boat, and then he rebuilt it. He testified that Judy helped him transport the plane. Judy testified that the couple used the Maule during the marriage. Judy argues that she cared for the

children while Ernest repaired the plane. The trial court found that Ernest used marital funds to purchase the engine and repair the plane and deemed it a marital asset, a finding that Ernest disputes. Ernest does not claim that he purchased the Maule before 1986, when the cohabitation period began. Therefore, the superior court properly deemed the airplane marital property because it was purchased during the coverture period, commencing at the start of the parties' cohabitation.

## IV. CONCLUSION

For these reasons, we AFFIRM the superior court's decision to award sole physical custody of Cody to Judy. We also AFFIRM the superior court's decision to categorize the Anvik home and lot, Talkeetna cabin, mining equipment, jet boat, Cessna, and Maule as marital property.

---

27. In any event, the superior court noted that even if the plane was a separate asset, it would invade Ernest's separate estate "to reach an equitable distribution of marital assets and to enable Judy to have a future that does not require her to remain in poverty." Ernest contends that

this statement was not supported by any reasoning on the part of the trial court. Because both parties' testimony supports the conclusion that the Cessna was purchased after the 1986 commencement of the coverture period, we need not reach this issue.