*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| BETH PINGREE, | ) |
| | ) Supreme Court No. S-16763 |
| Appellant, | ) |
| | ) Superior Court No. 3KO-15-00276 CI |
| v. | ) |
| | ) O P I N I O N |
| ANDRE COSSETTE, | ) |
| | ) No. 7263 – July 27, 2018 |
| Appellee. | ) |
| | ) |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Kodiak, Pat L. Douglass and William F. Morse, Judges.

Appearances: Melvin M. Stephens, II, Kodiak, for Appellant. Jill C. Wittenbrader, Law Office of Jill Wittenbrader, LLC, Kodiak, for Appellee.

Before: Stowers, Chief Justice, Winfree, Maassen, and Carney, Justices. [Bolger, Justice, not participating.]

WINFREE, Justice.

## I.     INTRODUCTION

A couple had a daughter together and then separated while she was still very young. The parents lived in different towns and alternated physical custody of the daughter. After they were unable to agree on a permanent arrangement for shared custody, the mother filed a complaint for primary physical custody and the father counterclaimed for the same. Both parents wanted primary physical custody during the

school year; the father, a commercial fisherman, was unavailable for two to three summer months each year. The superior court found that equal custody time was appropriate but impossible given the separate domicile locations, and also that minimal custodial time with the father would be harmful to the daughter. The court therefore awarded primary physical custody to the father, so long as the parents continue to live in separate locations. The mother appeals. Seeing no reversible error in the court's evidentiary decisions, factual findings, or discretionary decisions, we affirm the superior court's custody decree.

## II.    FACTS AND PROCEEDINGS

Beth Pingree and Andre Cossette lived together in Kodiak; in August 2013 Beth gave birth to their daughter. Their daughter lived with Beth and Andre in the Kodiak home or at the Pingree family lodge near Uganik. Beth was with their daughter most of the time, and Andre was with the two of them when not commercial fishing.

Beth and Andre separated in February 2015, when Beth ended the relationship and permanently moved to Uganik, taking their daughter with her. Andre remained in contact with their daughter when Beth traveled to Kodiak and when he visited Uganik. In October Beth and their daughter visited Andre in Kodiak to discuss a custody plan, but discussions broke down and Beth and their daughter returned to Uganik. Beth then emailed Andre, telling him that she would not return to Kodiak with their daughter, that he was not welcome in Uganik, and that she did not want him to contact her. Andre responded through counsel by proposing a week-on, week-off custody plan, to which Beth eventually agreed.

In November Beth filed a custody complaint, requesting primary physical custody and joint legal custody. Andre answered and counterclaimed for primary physical custody. The superior court held an interim custody hearing in mid-February 2016 and found that the statutory best interests factors were either inapplicable, weighed

equally for both parents, or weighed equally against both parents. The court concluded that equal time with both parents was in their daughter's best interests and ordered the week-on, week-off schedule to continue.

The court appointed a custody investigator to assess the case. The week-on, week-off schedule continued during the investigation until August, when Beth moved to Soldotna to pursue Emergency Medical Technician (EMT) training. Andre then moved for custody modification, arguing that weekly travel from Kodiak to Soldotna was prohibitively expensive. The court found the move was a substantial change in circumstances and modified the interim custody arrangement to a month-on, month-off schedule to reduce transitions. Beth later moved to Homer, working as a volunteer firefighter/EMT with the goal of permanent employment at the local fire station. The move to Homer did not affect the month-on, month-off schedule.

The case was reassigned to another superior court judge in February 2017, who presided over a two-day hearing on March 15 and May 2. Beth and Andre agreed on joint legal custody, but each sought primary physical custody; both parents wanted physical custody during the school year.

Beth testified about background information and discussed her life in Homer. Beth also testified that their daughter's first years had been primarily lived with Beth and that she had tried to facilitate their daughter's relationship with Andre. Beth and her supporting witnesses testified about the daughter's emotional distress at leaving Beth and the daughter's changed behavior while with Andre. They reported that she regressed in potty-training, wet herself repeatedly, could no longer sleep without milk, refused to let Beth leave her sight, became remote and brooding, and had repeated nightmares. Beth reported one especially troubling incident when their daughter returned from Kodiak and made several statements suggesting sexual abuse. Beth took their daughter to have medical exams twice, but neither exam could be completed because the

daughter refused to let a practitioner examine her below the waist. An Office of Children's Services (OCS) social worker who worked with the family to respond to the incident testified that OCS investigated, but, after concluding that it was being drawn into a custody battle, it closed the case. A retired judge from Minnesota who regularly visited the Pingree lodge testified that the daughter was exhibiting extreme behavior, and he opined that Beth should receive primary custody.

Beth also sought to introduce into evidence four questionnaires submitted by her witnesses to the custody investigator. Andre objected that the questionnaires "contain[ed] a lot of hearsay statements" and the superior court excluded all four.

Andre testified about his own view of the background information and described his caring for their daughter as a baby and pre-separation. He also testified about their daughter's life in Kodiak, the enrichment activities he provided her, and how he had not noticed any behavioral distress while she was with him. Andre testified that he fished or worked various jobs throughout the year but that he was guaranteed to be salmon fishing in Bristol Bay every June and July. Andre's friends and family supported his testimony that the daughter was happy and thriving when with him, as did Sun'aq tribal workers who provided him parenting classes. A pilot who facilitated some of the transitions between Uganik and Kodiak testified that he did not notice anything unusual at transitions like the distress Beth was reporting.

Throughout the hearing there was evidence that Beth used corporal punishment on the daughter by switching her with an alder twig. The superior court made three comments suggesting its disapproval of the practice, including that it would order Beth to stop the switching because it was close to a criminal act. But the court apparently did not issue such an order.

The superior court entered a custody order in June, awarding joint legal custody and primary physical custody to Andre. The custody order began with a case

synopsis and fact summary. The court summarized each party's evidence, the daughter's behavioral issues, and the issue of potential sexual abuse. The court attributed the daughter's behavioral difficulties to the on-off transitions, finding that her behavior subsided after the change to a month-on, month-off schedule, and it did not make any findings about sexual abuse. The court also noted, without further analysis, that Beth used a switch and that she did not think it was inappropriate. The court then found that none of the witnesses were lying and that all of the testimony "was basically true." But the court also found the retired judge was unnecessarily "eager[] to express his opinion," and it disregarded his testimony. The custody order did not refer to the custody investigation report or custody investigator's testimony in any way.

The custody order then set forth the court's analysis. The custody order contained a general analysis of the daughter's best interests roughly corresponding to the statutory best interests factors.[1] The court found that: the daughter had the usual needs of a three-year-old child and her only special needs were caused by her parents living apart; both parents were capable, could care for their daughter, and did care for her; the daughter was too young to have a parental preference; both parents loved their daughter and their daughter loved them; the daughter spent most of her young life with Beth but the daughter's life with Andre was "impress[ive]," and she should continue having "as close to equal time with each parent" as possible; Beth was resistant to letting Andre play an equal role in their daughter's life; there was no evidence of domestic violence; and there was no evidence of substance abuse.

The court found that having equal time with each parent would not be possible unless the parents lived in the same community. The court then found that

---

[1]     *See* AS 25.24.150(c) ("The court shall determine custody in accordance with the best interests of the child . . . . In determining the best interests of the child the court shall consider [eight factors plus any other relevant factors].").

giving Beth primary physical custody would be harmful to the daughter because she would only see Andre for four weeks a year, as he would be fishing during his summer custody. The court therefore gave Andre primary physical custody beginning when school started, with Beth having summer visitation, contingent on the parents continuing to live in different towns.

Beth appeals.

## III.    STANDARD OF REVIEW

Superior courts are vested with "broad discretion" in making child custody decisions.[2] "We will reverse a trial court's resolution of custody issues only if . . . convinced that the record shows an abuse of discretion or if controlling factual findings are clearly erroneous."[3] The superior court abuses its discretion when it assigns too much weight to some factors while ignoring others,[4] fails to consider statutorily mandated factors,[5] elevates the parents' interests above the child's,[6] or considers impermissible factors.[7] A fact finding is clearly erroneous when our "review of the entire

---

[2]    *Vachon v. Pugliese*, 931 P.2d 371, 375 (Alaska 1996).

[3]    *Id.* (quoting *Gratrix v. Gratrix*, 652 P.2d 76, 79-80 (Alaska 1982)).

[4]    *Id.* (quoting *Gratrix*, 652 P.2d at 80).

[5]    *Chesser v. Chesser-Witmer*, 178 P.3d 1154, 1157 (Alaska 2008) (quoting *J.L.P. v. V.L.A.*, 30 P.3d 590, 594 (Alaska 2001)).

[6]    *Vachon*, 931 P.2d at 375 (quoting *Gratrix*, 652 P.2d at 80).

[7]    *Carle v. Carle*, 503 P.2d 1050, 1055 (Alaska 1972), *superseded on other grounds by statute*, ch. 63, § 30, SLA 1977. Whether a factor itself is permissible or impermissible, however, we decide using our independent judgment. *See id.* ("We think it is not permissible, in a bicultural context, to decide a child's custody on the hypothesis that it is necessary to facilitate the child's adjustment to what is believed to be the dominant culture. Such judgments are, in our view, not relevant to the determination of
(continued...)

record leaves us 'with a definite and firm conviction that a mistake has been made.' "[8] "The trial court's factual findings enjoy particular deference when they are based 'primarily on oral testimony, because the trial court, not this court, judges the credibility of witnesses and weighs conflicting evidence.' "[9] Clearly erroneous fact findings are reversible error when they are "controlling," but not if they are immaterial.[10] The superior court's evidentiary decisions are reviewed for abuse of discretion.[11]

## IV. DISCUSSION

Beth argues that the superior court erred in evidentiary decisions, factual findings, and the ultimate custody decision. We address each of her arguments in turn.

### A. The Custody Order Is Not Legally Flawed By Erroneous Consideration Of The Evidence.

Beth argues that the final custody order is "flawed by an inappropriately selective consideration and discussion of the evidence." She contends the superior court erred by: (1) failing to discuss the custody investigation report; (2) excluding four questionnaires that informed the custody investigator's report; and (3) disregarding the retired judge's testimony. We see no error.

---

[7]     (...continued)
custody issues.").

[8]     *Millette v. Millette*, 177 P.3d 258, 261 (Alaska 2008) (quoting *Dingeman v. Dingeman*, 865 P.2d 94, 96 (Alaska 1993)).

[9]     *Sheffield v. Sheffield*, 265 P.3d 332, 335 (Alaska 2011) (quoting *Josephine B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 174 P.3d 217, 222 (Alaska 2007)).

[10]     *See Vachon*, 931 P.2d at 375 ("We will reverse a trial court's resolution of custody issues only if . . . convinced that . . . *controlling* factual findings are clearly erroneous." (emphasis added) (quoting *Gratrix*, 652 P.2d at 79-80)).

[11]     *Marron v. Stromstad*, 123 P.3d 992, 998 (Alaska 2005).

First, Beth argues that "the trial judge . . . should not be permitted to ignore the custody investigator's input without comment," or, alternatively, that failing to do so was an abuse of discretion "on the facts of this case." But we addressed and rejected identical arguments in *Chase v. Chase*.[12] In that case a parent argued that the superior court abused its discretion because it "simply ignored the custody investigator's report without explaining why the court chose to disregard the report."[13] We rejected that argument, holding that "the trial court is not obligated to adopt a custody investigator's recommendations" and "is under no obligation to make specific findings regarding the report as long as the court considers the appropriate statutory factors."[14]

To the extent Beth wants a per se rule that a court must at least discuss a custody investigator's report when it disagrees with the custody investigator, that rule was considered and rejected in *Chase*.[15] To the extent Beth is arguing only that it was an abuse of discretion not to discuss the custody investigator's report in this case, this case is indistinguishable from *Chase*.[16] We therefore hold that the superior court did not abuse its discretion by failing to discuss the custody investigator's report.

---

[12]     109 P.3d 942, 945-46 (Alaska 2005).

[13]     *Id.* at 945.

[14]     *Id.* at 945-46.

[15]     *See id.*

[16]     *See id.* Though Beth does not attempt to distinguish *Chase* on this ground, the custody investigator apparently did not testify in that case. But the difference does not affect our analysis; "the court ordinarily has no obligation to accept expert testimony when it finds other evidence more persuasive; nor is the court bound to favor the testimony of an ostensibly neutral witness who is unconvincing over that of a witness who testifies convincingly despite circumstances suggesting potential bias." *Id.* at 946 (quoting *Evans v. Evans*, 869 P.2d 478, 480 (Alaska 1994)).

Second, Beth argues that the superior court should not have excluded each questionnaire in its entirety simply because it contained hearsay statements and that the questionnaires themselves (which obviously are hearsay[17]) are admissible under the rule of completeness, Alaska Evidence Rule 106, to complete the custody investigation.[18] We find Beth's rule-of-completeness argument unpersuasive.[19] Rule 106 provides: "When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." The questionnaires are not admissible under this Rule. Rule 106 was adopted to prevent a party from creating a "misleading impression . . . by taking matters out of context."[20]

---

[17]    *See* Alaska R. Evid. 801(c) ("Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."). Statements under this rule include writings, like the questionnaires. *See* Alaska R. Evid. 801(a) ("A statement is . . . an oral or written assertion . . . .").

[18]    Beth cursorily mentions the common law rule of completeness and Alaska Evidence Rule 803(6) or (8) as alternative reasons for admission. But these passing references are undeveloped and are therefore abandoned. *See Adamson v. Univ. of Alaska*, 819 P.2d 886, 889 n.3 (Alaska 1991) ("[W]here a point is given only a cursory statement in the argument portion of a brief, the point will not be considered on appeal.").

[19]    We do not address Beth's argument that the superior court should not have excluded the questionnaires in their entirety simply because they contained some hearsay statements, because the questionnaires *themselves* were inadmissible hearsay.

[20]    *See* Fed. R. Evid. 106 advisory committee's note to 1972 proposed rule (commenting on substantively identical federal rule). The Alaska Supreme Court Committee on Rules of Evidence voted to adopt the federal advisory committee's commentary on Rule 106 as the commentary to Alaska Evidence Rule 106. Alaska R. Evid. 106 cmt.; *see also Marron v. Stromstad*, 123 P.3d 992, 1004 (Alaska 2005);
(continued...)

Beth's argument that the questionnaires were admissible as "source material" for the custody investigator does not fit within the scenario Rule 106 was designed to prevent; Beth points to no misleading impression that stemmed from considering only the custody investigator's report.

Beth's "source material" argument strongly resembles an argument for disclosure under Alaska Evidence Rule 705. Custody investigators, as a type of expert, do not have to rely only on admissible evidence in forming their opinion, and evidence they rely on may be disclosed during the investigator's testimony.[21] But even if this Rule could have been the evidentiary basis for Beth's proffer of the questionnaires, the record shows that Beth offered each witness's questionnaire while that witness was on the stand to bolster that witness's testimony, rather than to explain the custody investigator's testimony. The superior court did not abuse its discretion by excluding the questionnaires on a hearsay basis.

Third, Beth argues that the retired judge's testimony was no different from the other witnesses and that a retired judge serving as a fact witness should not be subjected to heightened credibility standards. But the issue here is not heightened credibility; the superior court simply weighed the judge's testimony as it would that of any other witness, and it found that the judge's "eagerness to express his opinion

---

[20]     (...continued)
("Alaska's rules of evidence are similar to, and were modeled after the Federal Rules of Evidence."); *Estate of Arrowwood ex rel. Loeb v. State*, 894 P.2d 642, 647 & n.24 (Alaska 1995) (relying on advisory committee's note to federal rules to interpret Alaska Rules of Evidence).

[21]     *See* Alaska R. Evid. 703 ("Facts or data need not be admissible in evidence, but must be of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject."); Alaska R. Evid. 705(a) ("The expert may in any event disclose on direct examination, or be required to disclose on cross-examination, the underlying facts or data . . . .").

undercut[] the neutrality of his reported observations." "[T]he trial court, not this court, judges the credibility of witnesses."[22] The superior court reasonably discounted the judge's testimony based on his unnecessary attempts to bolster his opinion and the court's firsthand view of all the evidence.

We therefore find no reversible error in the superior court's consideration of the evidence.

**B.     Controlling Factual Findings Are Not Clearly Erroneous.**

Beth next argues that the superior court made five clearly erroneous factual findings to support its decision. Because controlling factual findings are supported by the record, we see no reversible error.

**1.     The superior court's finding that it asked Beth if Andre had behaved inappropriately is clearly erroneous but immaterial.**

Beth first argues that the superior court clearly erred when it noted: "At the hearing the [c]ourt asked [Beth] if she suspected [Andre] had done something unacceptable. She said no." Beth argues that, because this interaction never occurred, we must be wary of all of the superior court's findings. Beth also intimates that she may have said something different if actually asked this question.

Beth appears to be correct that the superior court clearly erred by making this finding. We have not been able to find, nor has Andre pointed us toward, any record evidence that this interaction occurred. The superior court likely was referring to the following question between Beth and her counsel:

> Q:     In regards to the OCS incident, you heard testimony today that indicated there was some sort of an accusation or implication that Andre was the

---

[22]     *Sheffield v. Sheffield*, 265 P.3d 332, 335 (Alaska 2011) (quoting *Josephine B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 174 P.3d 217, 222 (Alaska 2007)).

perpetrator — and I hate — that word just doesn't seem right — but was the perpetrator. Did you ever accuse Andre of doing this?

A:    No.

Q:    And was it your intent to convey that he had done something?

A:    No.

Even if clear error, this was not a "controlling factual finding" and therefore not reversible error.[23]  Beth's counsel's question was substantially similar to the court's memory, and Beth has not argued here that Andre committed an act of domestic violence or child abuse that requires a different weighing of the best interests factors.[24]  The erroneous finding is immaterial.

> **2.    The finding that Andre could spend only four weeks a year with their daughter if he did not receive primary physical custody is not clearly erroneous.**

Beth next argues that the superior court clearly erred by finding that Andre could remain involved in their daughter's life for only four weeks per year if Beth had primary physical custody.  Beth argues that the hearing testimony and our judicial notice of the Homer school calendar would show that Andre could be meaningfully involved and have at least six weeks of guaranteed visitation each summer, plus an additional two weeks during school year breaks.

---

[23]    *See supra* note 10 and accompanying text.

[24]    *See* AS 25.24.150(c)(6) (directing court to disregard parent's willingness to facilitate close relationship between other parent and child if "one parent shows that the other parent has sexually assaulted or engaged in domestic violence against the parent or a child, and that a continuing relationship with the other parent will endanger the health or safety of either the parent or the child"); AS 25.24.150(c)(7) (directing court to consider "any evidence of domestic violence, child abuse, or child neglect").

The superior court did not clearly err. Beth argues on appeal that the Homer school calendar shows the first day of school is the day after Labor Day, which means Andre could have six weeks of physical custody each summer if she has primary custody. But Beth never presented this calendar to the superior court, and, when the court asked when their daughter would see Andre, Beth expressly agreed with the court that it would be two to four weeks. In this posture, the propriety of this court taking judicial notice of the Homer school calendar for the first time on appeal is questionable at best.

First, taking judicial notice of a fact not presented below presents serious fairness concerns to the opposing party. The case was litigated on the joint assumption that Andre would have limited time during the summer. Second, taking judicial notice of a fact not presented below presents serious judicial economy concerns. Even if Beth did not actually do so in this case, she could have strategically withheld this information to bolster her appeal to require a remand, delaying finality and expending more court resources. Third, taking judicial notice of a school calendar is unwieldy. School calendars may be generally stable, but there is no guarantee that school will also start in September next year, or the year after that, or any of the following years that their daughter will be school age. Finding clear error based solely on this year's calendar is in the nature of speculation.

We thus decline to take judicial notice in this case.[25] Without such notice, the evidence before the superior court (and Beth and her counsel's own representations)

---

[25] *See Dault v. Shaw*, 322 P.3d 84, 97 n.5 (Alaska 2013) (Winfree, J., dissenting) ("[W]hether an appellate court will for the first time take judicial notice of a judicially notable fact rests largely in its own discretion." (quoting *Mills v. Denver Tramway Corp.*, 155 F.2d 808, 812 (10th Cir. 1946))).

supports its finding of four weeks' physical custody. We are not left "with a definite and firm conviction that a mistake has been made."[26]

### 3. The finding that the daughter should have as close to equal time with each parent as possible is not clearly erroneous.

Beth next challenges the superior court's finding that the daughter should have as close to equal time with each parent as their schedules permit. Beth argues that the finding is not supported by the record and is therefore "a statement of judicial preference and . . . a non-statutory legal standard."

Although Beth is correct that a judicial preference to equalize parenting time without regard to the daughter's best interests would be error,[27] we are not persuaded that the superior court's finding was a statement of judicial preference rather than a true fact finding of what was important to the daughter based on the record. The court expressly noted that "it is important that [the daughter] have as close to equal time" with her parents as possible. This reference to importance to the daughter was immediately followed by the statement that "[b]oth have much to offer" her. And the record is replete with evidence that Beth and Andre were both supportive parents from whom their daughter benefitted: Beth primarily cared for their daughter for the first two

---

[26] *See Millette v. Millette*, 177 P.3d 258, 261 (Alaska 2008) (quoting *Dingeman v. Dingeman*, 865 P.2d 94, 96 (Alaska 1993)). Even if we were to take judicial notice, Beth has not presented a convincing argument that this was a "controlling" fact finding. *See supra* note 10. The superior court reasoned that "it is important that [their daughter] have as close to equal time with each parent as their schedules permit" and that being in Andre's care for only four weeks a year "would be harmful to her." The difference between four weeks and eight weeks, or a 92/8 split and 85/15 split, likely would have made no difference to the superior court's decision.

[27] *See Vachon v. Pugliese*, 931 P.2d 371, 375 (Alaska 1996) ("On review we must determine whether that discretion has been abused, . . . perhaps by elevating the interests of one of the parties to the dispute above that of the child . . . ." (quoting *Gratrix v. Gratrix*, 652 P.2d 76, 79-80 (Alaska 1982))).

years of her life; Andre shared in parenting duties when their daughter was a baby; Beth kept a stable routine in Uganik; Andre has a weekly enrichment schedule with educational, physical, and cultural activities; Beth ensures their daughter has friends and play dates; Andre ensures she has a friend group her age; Beth has provided her healthcare and daycare; and Andre has enrolled in parenting classes through the Sun'aq tribe of Kodiak. When the record contains such evidence, equal custody time certainly is not inappropriate.[28] We are not left with a "definite and firm conviction that a mistake has been made."[29]

### 4. The finding that the daughter's distress lessened after switching to a month-on, month-off schedule is not clearly erroneous.

Beth next challenges the superior court's finding that the daughter's emotional distress grew "less severe after the alternate month schedule began." Beth argues that the superior court clearly erred because she and her mother testified the daughter's distress was growing worse and there is no evidence to the contrary.

Although the superior court may have clearly erred if Beth's assertions about the record were necessarily true, they are not. The custody investigator testified that "it sounds like she's adapted to this alternating month schedule." And Beth herself testified:

> Q: When the month-on/month-off visits started, did you notice a difference . . . compared to the week-on/week-off visits?

---

[28]     *See Faulkner v. Goldfuss*, 46 P.3d 993, 999 (Alaska 2002) ("The legislature has stated that 'it is generally desirable to assure a minor child frequent and continuing contact with both parents after the parents have separated . . . .' " (quoting ch. 88, § 1(a), SLA 1982)).

[29]     *See Millette*, 177 P.3d at 261 (quoting *Dingeman*, 865 P.2d at 96).

A:    Compared to the week-on and week-off visits, she still continues to have potty accidents for, like, the week after she comes. *I think the difference is that she has enough time to actually get settled in a household.* We have — the first week she gets there is usually — again, it's — there's potty accidents. She's got massive anxieties about, you know, me leaving, don't go out of my sight.

*Usually about the second week she finally settles down a little bit. The potty accidents stop. Her anxiety levels seem to drop a little bit. I can safely go to the bathroom or carry a grocery bag in from the car without her completely freaking out.*

That usually — *she seems to settle in and be comfortable for about two weeks,* until she knows that she's getting ready to leave again. (Emphases added.)

Beth's own testimony thus supports the superior court's finding that the disruptions as a whole were "less severe," even if the transition periods themselves remained difficult. We are not left with a "definite and firm conviction that a mistake has been made."[30]

### 5.    The finding that Beth is resistant to letting Andre play an equal role in the daughter's life is not clearly erroneous.

Beth finally argues that the superior court clearly erred by finding that she is "resistant to having [Andre] play an equal role in [the daughter]'s life, despite her articulations to the contrary." Beth argues that the record cannot support this finding unless we accept the superior court's reasoning, which uses Beth's petition for primary

---

[30]    *See id.* (quoting *Dingeman*, 865 P.2d at 96). We recognize that Beth testified that the transitions themselves remained difficult, and we understand her concerns. But we do not read the final custody order as finding that the difficulties had disappeared, only lessened. To the extent Beth is challenging the superior court's failure to award her primary physical custody because the transitions themselves remain difficult, we address that issue *infra* at p. 19.

physical custody as some evidence that she does not want Andre in their daughter's life. Beth argues that using her desire for primary physical custody is wholly inappropriate, "erroneous being something of an understatement."

"[T]he trial court, not this court, judges the credibility of witnesses and weighs conflicting evidence."[31] And there is "conflicting evidence" that supports the superior court's finding, including Andre's testimony that Beth will not faciliate co-parenting with him and is rude and cold at exchanges, Beth's testimony that she had not considered when their daughter would see Andre under her custody plan, and Beth's testimony that she had not been courteous to Andre's family at exchanges. Once more, we are not left with a "definite and firm conviction that a mistake has been made."[32]

Beth's argument that the superior court erred by referencing her custody petition as evidence presents a closer question. When parents live in separate locations, a parent's desire to have primary physical custody should not be weighed against that parent absent additional facts indicating unwillingness to facilitate the other parent's relationship. But it is not so clear that the superior court was referring to the bare fact that Beth filed her custody petition, instead of the practical effect of her legal requests on her daughter. And, as we have noted, here there was plentiful other evidence supporting the superior court's finding, and the order makes clear that the court would order a 50/50 split if either parent moved close enough to the other to make shared custody feasible. Because there is other evidence in the record to support the superior court's finding, that finding is not clearly erroneous.

---

[31]     *Sheffield v. Sheffield*, 265 P.3d 332, 335 (Alaska 2011) (quoting *Josephine B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 174 P.3d 217, 222 (Alaska 2007)).

[32]     *Millette*, 177 P.3d at 261 (quoting *Dingeman*, 865 P.2d at 96).

**C. The Superior Court Did Not Abuse Its Discretion By Awarding Andre Primary Physical Custody.**

Beth argues that the superior court abused its discretion in four ways: equalizing parenting time at the expense of the daughter's best interests; attaching not enough weight to Beth's ability to meet the daughter's needs and too much weight to the daughter's and Andre's love and affection for each other; impermissibly considering Beth's corporal punishment practices without finding harm; and failing to give symmetric consideration to the daughter's detriment from living with Andre compared to living with Beth. We perceive no abuse of discretion in the final custody decision.

**1. The superior court did not equalize parenting time at the expense of the daughter's best interests.**

Beth's first argument is that the superior court abused its discretion by "prioritizing the importance of equality of parental access to [the daughter] at the expense of her best interests." Beth argues that allowing the court's decision to stand paves the way for any parent who fishes during summers to automatically obtain primary physical custody.

We reject Beth's argument because it depends on our concluding that the superior court clearly erred by finding that equal time with both parents is important to their daughter. For the reasons discussed above, there was no clear error. As a whole the court's order reflects its finding that the parents should have equal physical custody based on the best interests factors. In other words, Andre did not receive primary physical custody *automatically* because he fishes during the summers; he received primary physical custody because awarding one parent roughly 90% and the other only 10% custody time would be harmful, and this was the only workable option. Given the court's findings of the importance of equal time and the harm and benefit to the daughter, there was no abuse of discretion.

## 2. The superior court did not misweigh the daughter's need for her mother and father.

Beth next argues that the daughter's distress shows that her need for stability, continuity, and emotional care will all be better served by Beth. Beth argues that the superior court created a "false equivalence" between the daughter's happiness while in Andre's care and her distress while in Beth's.

Beth's argument overstates our role on review. "Custody disputes are among the most difficult matters which confront a trial judge. As a consequence, [we have] often noted that trial courts enjoy wide discretion in resolving custody disputes."[33] When we do reverse a superior court's decision for misweighing the custody factors, we do so because the weight the superior court accorded a factor is not supported by the record.[34] This case does not present such a custody decision.

First, as to Beth's argument that the superior court did not give enough weight to the daughter's emotional and social needs, the court's decision shows that it did consider the daughter's needs. The court noted that it was "concerned" by Beth's testimony about the daughter's reluctance to be with Andre but that "equally powerful and convincing testimony . . . caused the [c]ourt to question its initial impressions." The court also found that the daughter's emotional difficulties were caused by her "different experiences in the environments each parent offered," that the constant transitions were a likely source of the difficulties, and that Andre was able to meet the daughter's special needs caused by the difficulty of transitions, along with all of her other needs, once she

---

[33] *Craig v. McBride*, 639 P.2d 303, 304 (Alaska 1982).

[34] *See Rego v. Rego*, 259 P.3d 447, 459-60 (Alaska 2011) (affirming custody order because evidence was not out of step with weight given to factors); *West v. West*, 21 P.3d 838, 843 (Alaska 2001) (reversing custody order because weight was based on assumptions and not evidence).

was in his care. As we explained above, the court's finding that the daughter's distress lessened was not clearly erroneous because the evidence shows she tended to improve once she was in one parent's care for a longer period. The court properly considered this in its order and concluded that the daughter's needs could be met if Andre had primary physical custody. Given this record, the court did not underweigh Beth's argument that she was better able to meet the daughter's needs.

Second, as to Beth's argument that the superior court gave too much weight to Andre's and their daughter's love and affection for each other, the evidence is not dramatically out of step with the weight the court gave to testimony about the daughter's life with Andre. Beth argues that "[t]estimony that [their daughter] was genuinely happy when [in Andre's care] simply does not address the plethora of evidence that [she] was emotionally distraught on multiple occasions when she was told she would have to leave her mother." But the court's analysis on this point was about whether Andre could meet the daughter's needs, and the court was not unreasonable in concluding that the daughter's happiness in Andre's care rebutted testimony that she was not. Given the lack of a dramatic disparity between the evidence and the weight given it by the court, we are not persuaded that the daughter's distress at leaving Beth required Beth to have primary physical custody.

### 3. The superior court's views on corporal punishment did not affect its final custody order.

Beth argues that the superior court's repeated comments expressing disapproval of her disciplinary practices show a "deeply seated aversion" to corporal punishment that "casts an unacceptable shadow upon the validity of [its] ruling." Beth argues that the court's personal views on corporal punishment are irrelevant unless the court found that her discipline was "excessive or harmful."

Beth is correct that courts may not consider "impermissible factors" in the best interests analysis or "decide the custody issue on the basis of cultural assumptions which are not borne out by the record."[35] Though courts have broad discretion to consider any "factors that the court considers pertinent" when making custody determinations,[36] this discretion is not unlimited. Evidence of a parent's "lifestyle, habits, or character" is generally irrelevant.[37] For instance, we have vacated custody determinations that considered the desirability of a Native child assimilating to white culture,[38] a parent's having children out of wedlock,[39] a parent's sexual conduct,[40] a parent's sexual orientation,[41] a parent's mental health,[42] and the "tender years" doctrine.[43]

The general rule for these impermissible factors is strict: "To avoid even the suggestion that a custody award stems from a life style conflict between a trial judge and a parent, . . . trial courts must scrupulously avoid reference to such factors . . . ."[44]

---

[35] *Carle v. Carle*, 503 P.2d 1050, 1055 (Alaska 1972).

[36] *See* AS 25.24.150(c)(9).

[37] *Britt v. Britt*, 567 P.2d 308, 311 (Alaska 1977).

[38] *See Carle*, 503 P.2d at 1054-55.

[39] *See Craig v. McBride*, 639 P.2d 303, 305-06 (Alaska 1982).

[40] *See Bonjour v. Bonjour*, 566 P.2d 667, 669 (Alaska 1977).

[41] *See S.N.E. v. R.L.B.*, 699 P.2d 875, 879 (Alaska 1985).

[42] *See Morel v. Morel*, 647 P.2d 605, 608 (Alaska 1982).

[43] *See Johnson v. Johnson*, 564 P.2d 71, 74 (Alaska 1977). The tender years doctrine presumes that awarding maternal custody of a young child is in the child's best interests. *Id.*

[44] *Craig*, 639 P.2d at 306.

But certain lifestyle evidence, though generally impermissible, may properly be considered if grounded in the child's best interests.[45] For instance, courts may properly consider the sexual conduct of a parent when there is "evidence of an adverse effect to the parent-child relationship."[46] Thus, the rule is that courts may consider otherwise impermissible factors when there is "evidence of an adverse effect"[47] on the parent-child relationship as opposed to "cultural assumptions which are not borne out by the record."[48]

There is no evidence in the record that Beth's switching adversely affected the parent-child relationship, so our analysis is confined to whether differing views on corporal punishment present "a life style conflict between a trial judge and a parent."[49] If they do, the superior court's comments would have been improper. But if not, the comments could reflect a legitimate consideration of the daughter's best interests under the catch-all provision of AS 25.24.150(c).[50]

We conclude that differing views on corporal punishment present a lifestyle conflict between trial judge and parent. Our decision on this issue has ultimately been made for us; the legislature crafted the best interests standard, and the legislature has

---

[45] *Id.* at 305.

[46] *Id.* at 306.

[47] *See id.*

[48] *See Carle v. Carle*, 503 P.2d 1050, 1055 (Alaska 1972).

[49] *See Craig*, 639 P.2d at 306.

[50] *See* AS 25.24.150(c)(9) ("[T]he court shall consider . . . other factors that the court considers pertinent.").

determined that corporal punishment can be in a child's best interests.[51] It was therefore inappropriate for the superior court to comment on Beth's practice in a way that suggested disapproval without first finding harm to the child.[52]

In this case, however, the potential error did not affect the superior court's disposition. The court did not order Beth to stop using corporal punishment, and it did not tie corporal punishment into its best interests analysis. The court explicitly noted that it would order a 50/50 custody split if the parents lived in the same locality, despite its comments about corporal punishment. Given these facts, it is clear the court did not rely on Beth's corporal punishment to reach its child custody decision.[53]

### 4. The court superior did not violate the "symmetric consideration" rule or penalize Beth for moving to Homer.

We previously have ruled that superior courts must consider the best interests of the child when a parent intends to move by considering consequences to the child with both the moving parent and non-moving parent.[54] Beth argues that the court violated this "symmetric consideration" rule by considering only their daughter's

---

[51]     *See* AS 11.81.430(a)(1) ("The use of force . . . is justified . . . [w]hen and to the extent reasonably necessary and appropriate to promote the welfare of the child . . . , a parent . . . use[s] reasonable and appropriate nondeadly force on that child.").

[52]     We remind trial judges that comments indicating extrajudicial preferences must be scrupulously avoided, to avoid even the appearance of impropriety. Especially in family law matters, a trial judge's personal preferences must be kept separate from the legal considerations. *Craig v. McBride*, 639 P.2d 303, 306 (Alaska 1982) ("[W]e reiterate that trial courts must scrupulously avoid reference to [impermissible] factors absent evidence of an adverse effect to the parent-child relationship.").

[53]     *Cf. S.N.E. v. R.L.B.*, 699 P.2d 875, 879 (Alaska 1985) ("Since the lower court's findings were impermissibly tainted *by reliance* in part on the fact that Mother is a lesbian, we remand this case to the superior court . . . ." (emphasis added)).

[54]     *Moeller-Prokosch v. Prokosch*, 99 P.3d 531, 535-36 (Alaska 2004).

detriment from living with Beth, not her detriment from living with Andre. Beth also argues that the court impermissibly "punished" her for moving to Homer by attempting to coerce her to move to Kodiak.

Beth's symmetric consideration argument misunderstands the purpose of the rule. The symmetric consideration test ensures that courts weigh costs and benefits to a child when one parent asks for a custody order reflecting their plan to move.[55] But it does not apply when the parents *already* live in separate locations at the time of the evidentiary hearing and the court hears evidence about the child's environment in both locations.[56] Here Beth had already moved to Homer and the court was able to weigh the evidence of stability in both Homer and Kodiak.

Beth's punishment argument is also faulty. Beth argues that the superior court erred when it included the following footnote in its custody order: "If both parties lived in the same town, say Kodiak, then the [c]ourt would craft a shared physical custody schedule during the school year." But this footnote does not show any desire by the court to punish Beth; it is simply another instance of the court's oft-repeated statement that a 50/50 custody split was in their daughter's best interests but was impossible because of the parent's living situations.[57] And the court aimed this criticism equally at both Beth and Andre:

> [T]here's another factor, which is if the two of you choose to live in separate locations, there's a tremendous impact on this

---

[55] *Van Sickle v. McGraw*, 134 P.3d 338, 342 (Alaska 2006).

[56] *Id.*

[57] *Cf. Rego v. Rego*, 259 P.3d 447, 455 (Alaska 2011) ("We [have] scrutinized the record before us in this case. We conclude that [Appellant]'s position [that the superior court was impermissibly punishing Appellant] is not supported by the record and would require us to apply undue skepticism to the superior court's decision.").

child.  So someone has to make a decision about either you returning to Kodiak or you moving to Homer.  I mean, that's what responsible parents do.  They sacrifice for their children.

We therefore perceive no abuse of discretion in the final custody order.

## V.    CONCLUSION

The superior court's custody order is AFFIRMED.